ROBERT W. DULLAM v. JAMES C. WILLSON.

*Governor's power to remove State officers.*

1. An information in quo warranto proceedings charged official misconduct and neglect of duty. The plea denied the charge. A replication was filed which merely reiterated the charges contained in the information, without specifying the acts of neglect and misconduct relied upon. It seems that such a replication is open to demurrer.

2. How. Stat. § 651, permitting the Governor to remove any State or county officer except the State treasurer and judges, is void, because at the

time it was adopted the Governor had no judicial power under the Constitution.

3. An unconstitutional statute does not become valid by the amendment of the Constitution.

4. Constitutional provisions must be construed with reference to each other when relating to the same subject matter.

5. The Governor's power of removal (Mich. Const. art. xii. § 8) can only be exercised for the specific causes mentioned in the Constitution, and upon charges which shall specify the particular acts or neglect relied on to make out the cause alleged; and the respondent must have notice of these charges and specific allegations, and reasonable notice of a time and place when and where he will have an opportunity for a hearing thereon, upon which he may produce proofs. And the Governor has judicial power to examine into and pass upon these charges.

Quo warranto.   Submitted Feb. 5.—Decided April 23.

*William P. Wells* and *James W. Romeyn* for relator, cited as to the joinder of demurrer and replication: *Rex v. Ginever* 6 Term 733; *People v. Richardson* 4 Cow. 119; the constitutional authority in the Governor to remove from office is a delegation or grant of power: Cooley's Const. Lim. 139; *Field v. People* 2 Scam. 80; the several departments of government are independent in their respective spheres of action: Cooley's Const. Lim., 42, 47, 115; courts have no jurisdiction to compel action by the executive if the act or power to perform it has been confided to the executive discretion: Cooley's Const. Lim. 116; High on Ext. Legal Rem.; *Hawkins v. Governor* 1 Ark. 570; *People v. Bissell* 19 Ill. 229; *People v. Gates* 14 Ill. 433; *Dennett's Case* 32 Me. 510; *State v. Kirkwood* 14 Ia. 162; *Hartranft's Appeal* 85 Penn. St. 433; *State v. Governor* 25 N. J. 331; *Mauran v. Smith* 8 R. I. 192; and especially *State v. Bartley* 39 Mo. 388; *Jonesboro v. Brown* 8 Baxt. 490; *Sutherland v. Governor* 29 Mich. 320; nor can they review his discretionary act: *Keenan v. Perry* 24 Tex. 253; *State v. Doherty* 25 La. Ann. 119: 13 Am. Rep. 131; *State v. Lamantia* 33 La. Ann. 448; *Attorney General v. Brown* 1 Wis. 513; *State v. Watertown* 9 Wis. 254; *State v. McGarry* 21 Wis. 497; *Platt v. Stout* 14 Abb. Pr. 178; 11 Abb. Pr. 17; *Bartlett's Case* 9 How. Pr. 414; *Dougan v. Lake County Court* 22 Am. L. Reg. (N. S.) 528; *Donahue v. Will County* 100 Ill. 94.

*Howard & Thayer* and *Isaac P. Christiancy* for respondent. Removals from office by the Governor at discretion and without cause are contrary to the policy of law: *People v. Lord* 9 Mich. 232; *Mead v. Ingham County Treasurer* 36 Mich. 419; it is for the judiciary to determine whether an officer has been guilty of misconduct or neglect of duty: Cooley's Const. Lim. (2d ed.) 91; *Page v. Hardin* 8 B. Mon. 648; *Ex parte Ramshay* 18 Q. B., 173; one shall not be deprived of his rights except by due process of law: *Den v. Murray* 18 How. 272; *Com. v. Slifer* 25 Penn. St. 28; he must have an opportunity for hearing and defense: *Rex v. Chancellor* 1 Strange 557; *In re Hammersmith Rent Charge* 4 Exch. 97; *Archbishop of Canterbury's Case* 1 El. & El. 545; *Harper v. Carr* 7 Term 266; *Rex v. Benn* 6 Term 198; *Capel v. Child* 2 Cr. & J. 558; *Abley v. Dale* 10 C. B. 71; *Williams v. Lord Bagot* 3 B. & C. 772; an office is property (2 Bl. Com. 36), and is within constitutional protection: *Wammack v. Holloway* 2 Ala. 31; *Hoke v. Henderson* 4 Dev. 19; notice must be given of any proceeding affecting rights and interests: *Meade v. Deputy Marshal* 1 Brock. 324; *Queen v. Simpson* 10 Mod. 380; *Chase v. Hathaway* 14 Mass. 222; *Arthur v. State* 22 Ala. 61; *Innes v. Wylie* 1 C. & K. 257; *State v. Stokes* Coxe 392; *Geddes v. Township Board* 46 Mich. 216; *Huber v. Reily* 53 Penn. St. 112; an officer who can be removed only for a specified cause must have notice of proceedings to remove him and a chance to defend himself: *Bagg's Case* 11 Co. 98; *Rex v. Gaskin* 8 Term. 209; *Rex v. Coventry* 1 Lord Raym. 391; *Rex v. Andover* id. 710; *Field v. Commonwealth* 32 Penn. St. 478; *Willard's Appeal* 4 R. I. 597.

CHAMPLIN, J. In January, 1881, respondent was duly nominated and appointed one of the trustees of what was then known as the Michigan Institution for Educating the Deaf and Dumb and the Blind, and now known as the Michigan Institution for Educating the Deaf and Dumb. The respondent duly qualified by taking and subscribing the oath of office, and entered upon the duties of said office. His term was for six years from the first Tuesday of February, 1881. On the 2d day of July, A. D. 1883, Hon. J. W. Begole, as Governor of the State of Michigan, filed in the Executive office of State a writing or certificate of removal from office, as follows, viz.:

"EXECUTIVE OFFICE, LANSING, July 2nd, 1883.

Whereas, it appears satisfactorily to me that James C. Willson, holding the office of trustee of the Michigan Institution for Educating the Deaf and Dumb, has been guilty of official misconduct and habitual neglect of duty, as such trustee, I therefore remove the said James C. Willson from his said office of trustee of the Michigan Institution for Educating the Deaf and Dumb.

[L. S.]　　　　　　　　　　JOSIAH W. BEGOLE.

By the Governor,
　　　　D. H. MCCOMAS,
　　　　　　Dep. Sec'y of State."

—which has ever since remained of record in the executive office, and a copy thereof was filed on said second day of July in the office of the Secretary of State, and has ever since remained there of record.

On the same second day of July said Governor gave notice to said Willson of his removal from said office by a notice in the words and figures following:

"EXECUTIVE OFFICE, LANSING, July 2nd, 1883.

*To James C. Willson, Esq.*—DEAR SIR: I have this day, for your official misconduct and habitual neglect of duty, removed you from the office of trustee of the Michigan Institution for the Deaf and Dumb; the reasons for such removal I shall lay before the Legislature at its next session in detail.

Yours respectfully,　　　　JOSIAH W. BEGOLE."

The Governor, also, on the second day of July appointed the relator a trustee to fill the vacancy occasioned by the removal of Willson, who refused to surrender up the office to relator, but continues to hold, use and exercise the office of trustee; whereupon, on the relation of said Dullam, the Attorney-General filed an information in this Court in the nature of a quo warranto, alleging that James C. Willson had usurped, intruded into and unlawfully holds and exercises the office of trustee of the Michigan Institute for the Education of the Dumb and Blind since said second day of July, 1883. The respondent interposed a plea in which he set forth his appointment and commission, and that he had entered upon the duties of his office; that he had continued faithfully to

perform its duties, and had not been guilty of the official misconduct or habitual neglect of duty as such trustee as asserted, intimated or claimed by the Governor in the writing or certificate signed by him ; that the notice touching or referring to his removal, dated July 2, 1883, was the only notice he ever received from the Governor, and aside from that he never received any notice or intimation from the Governor that any complaint or claim had ever been made to or by the Governor that he had been guilty of any official misconduct or habitual neglect of duty in his office ; and that he is still entirely ignorant of what official misconduct and neglect of duty he has been guilty of or that the Governor claims he has been guilty of.

A further plea contained the same allegations as the first, except the denial of having been guilty of any official misconduct or habitual neglect of duty. The People demurred to the first plea, and also replied to that part denying the official misconduct and habitual neglect of duty, asserting affirmatively that said Willson was guilty of official misconduct and habitual neglect of duty as declared by the Governor, and they demurred to the second plea. The respondent demurred to the replication, and the People joined in the demurrer.

Looking at this case as a matter of pleading, I think the demurrer to the replication is well taken. It was incumbent on the relator to state in his replication the specific acts of official misconduct and habitual neglect of duty the respondent was guilty of. As it stands, the respondent is no more apprised from the replication of what he is to meet than he is from the language of the information itself. But as both parties have disregarded all objections to the form of the pleadings, and have argued the case on its merits, I shall proceed to consider the case on the questions presented in the briefs of counsel.

That issue is whether, under the Constitution and laws of Michigan, the Governor has power to remove a State officer by such action as was taken in this case, viz.: an act of removal evidenced by writing, under the hand and seal of the executive, filed in the executive office, with notice thereof

to the officer removed, communicating to him the alleged grounds of removal, but without giving him notice of charges, complaint or claim of official misconduct or neglect of duty, or opportunity of hearing, or defense.

The question is one of considerable delicacy, as it requires one of the co-ordinate branches of the government to pass its judgment on the acts of another, and the presumption is that the executive department has the same desire to keep within constitutional limits as either of the other two. From the nature of our government, acting under a written constitution prescribing the jurisdiction and powers of each branch, it devolves upon the judiciary to decide upon the acts of the other departments whenever it is claimed that such action is not in harmony with the fundamental law, and an appeal is made to it to decide the controversy. In this instance we are relieved from those embarrassments which arise when the judicial department is applied to for the writ of mandamus to compel the executive to do some act in the executive or administrative department of government where courts seldom or never interfere, as is well illustrated by many authorities cited on the brief of relator's counsel.

The Constitution (article xii, § 8,) provides that: "The Governor shall have power and it shall be his duty, except at such time as the Legislature may be in session, to examine into the condition and administration of any public office, and the acts of any public officer, elective or appointed, to remove from office for gross neglect of duty, or for corrupt conduct in office, or any other misfeasance or malfeasance therein, either of the following State officers, to wit: the Attorney General, * * * or any other officer of the State, except legislative and judicial, elective or appointed, and to appoint a successor for the remainder of their respective unexpired term of office, and report the causes of such removal to the Legislature at its next session." This provision was not contained in the Constitution of 1835. It was added to the present Constitution, by amendment, by the

legislature of 1861, (Laws 1861, p. 588,) ratified by the people in 1862.

An existing statute—Comp. L. 1871, § 618 (How. Stat. § 651)—provides that the Secretary of State, Auditor General and all State and county officers, except the State Treasurer and judges, may, for official misconduct or habitual or willful neglect of duty, at any time during the recess of the Legislature, be removed, and the vacancy supplied during such recess by the Governor. This provision was in the Revised Statutes of 1846, ch. 15.

The information alleges that the removal was made in pursuance of the statute; and from the fact that the executive order removing the respondent follows the language of the statute instead of the Constitution, and fills the vacancy until the next session of the Legislature, instead of the unexpired term, I am convinced that the action was had under the statute. But if the power exists under the Constitution, it is immaterial that a misrecital is made as to its source, and would not invalidate the exercise of the power. I am satisfied that the statute furnishes no valid basis for the power of removal, because repugnant to the Constitution of 1835, which vested no judicial power in the Governor. The statute, being void, was not validated by the amendment of 1862, and the question depends solely upon the constitutional amendment of 1862. That provision must be construed in connection with others in the instrument of which it forms a part. In that instrument we find grants of executive power, and grants of judicial power; and we find rights reserved to the citizen, and restraints upon the exercise of executive, legislative or judicial power, in depriving any person of life, liberty or property without due process of law. Article V relates to the executive department; and while section 6 provides that the Governor "shall take care that the laws be faithfully executed," still the amendment under consideration was not added as a part of that article, but was added to article XII, which relates to "impeachments and removals from office." By this article the house of representatives has the sole power of impeachment; the senate, sitting as

a court, constitutes the tribunal before whom the impeachment is to be tried, and their judgment extends no further than removal from office; and the court for the trial of impeachment cannot sit until the final adjournment of the Legislature. While the Legislature is in session the Governor's power of removal is wholly suspended. The only way a removal from office of State officers could be accomplished, before the adoption of the amendment of 1862, was by impeachment preferred by the house of representatives. The provisions for impeachment still remain a part of the Constitution.

What was the object sought to be accomplished by the amendment? It contains an important grant of power combining both executive and judicial functions. There must have been evils existing which, it was thought, made such amendment necessary, which, through some defect in the Constitution, could not be remedied. The journals of the two houses of the Legislature disclose the fact that when they met in 1861 it was made known to them through the Governor's message that the State Treasurer, who had occupied that position the preceding term, was a defaulter; and that his defalcation was known to the Governor long before the assembling of the Legislature. But he was powerless to remove the incumbent from office. He could only be removed by impeachment, and that could not be done before his term of office expired without calling an extra session of the Legislature. It was apparent, also, that dereliction of duty of other State officers was as liable to occur at any time as had happened in the case of the State Treasurer, and that a removal during the recess of the Legislature might become necessary in order to protect the interests of the State, or to promote the public service; hence a joint resolution was introduced in the Legislature, and, after some amendments, was passed and submitted to the people in its present form, and they adopted it as a part of the Constitution at the general election of 1862. It is to the credit of the State that a period of over twenty years has elapsed before it has been thought necessary

by the executive to exercise the power conferred by that amendment.

It will be observed that the section of the Constitution under consideration only authorizes the Governor to remove for specified causes. He is not authorized to exercise the power at his pleasure or caprice. It is only when the causes named exist that the power conferred can be exercised. It follows as a necessary consequence that the fact must be determined before the removal can be made. It is also clear that the fact must be determined by some tribunal invested with judicial power, for a determination whether specified causes exist is the exercise of judicial functions. Judicial determination of facts must rest upon and be preceded by notice, proof and hearing. And the first question is, what is the proper tribunal in which such facts are to be ascertained? In my opinion this provision of the Constitution requires no legislation to make it effective. Read in the light of the history of the times, and the surrounding circumstances when it was adopted, the grant of power is to the Governor coupled with the duty enjoined to examine into the condition and administration of any public office, and to examine into the acts of any public officer, and to remove from office for gross neglect of duty, or for corrupt conduct in office, any of the officers specified. The amendment for this purpose clothes him with judicial power. It is implied in the grant, and without it the grant would be nugatory and ineffectual to accomplish the purposes for which it was given.

This construction is the only one that can be given to the section which will remedy the evil from which relief was sought by its adoption. He acts in the place of a court of impeachment during the time the Legislature is not in session. An exigency may arise when it would require prompt action to protect the public service or the interests of the State. The delays incident to common-law prosecutions and convictions for malfeasance in office would afford an inadequate, and, in some instances that might be suggested, no remedy. Besides, it should not be forgotten that the remedy by common-law prosecution existed, and could have been

pursued before the amendment was adopted. The law, since 1846, had declared a vacancy in any office when the person holding the same was convicted of an infamous crime, or of any offense involving a violation of his oath of office (Rev. Stat. 1846, p. 81 ; 1 Comp. L. 1857, § 475), and the Governor was fully authorized to fill such vacancy. Sess. L. 1851, p. 266 ; 1 Comp. L. 1857, § 490. To hold, therefore, after the amendment, the same prosecution and conviction must be had as before, to authorize the Governor to remove, would render the amendment not only a dead letter, but entirely unnecessary; for, as the law stood, *conviction created a vacancy* which the Governor might fill by appointment; and if a conviction must still be had by a prosecution in the common-law courts before the Governor can remove, we impute to ourselves the inconsistency of holding that the Governor must *assume* that there is an incumbent of an office, vacant under the statute, whom he can then proceed to remove under the Constitution.

That under the amendment the Governor was vested with the power of determining whether the specified causes exist, appears to me too plain for serious contradiction. I fully concur in the views expressed upon this point by the learned counsel for the respondent (Judge Christiancy), wherein he says : " It was competent, by constitutional amendment, to authorize him to exercise *such judicial* power. And while this amendment gives the power of removal only for the causes which it specifies (which, though similar in character, are not identical with those specified in the statute,) and the question of the officer's guilt is one judicial in its nature, yet the amendment imposes a duty and confers upon the Governor the power ' to examine into the condition and administration of the office and public acts of the officers' to which it applies, and to remove them from office *for the causes there enumerated ;* thus, in effect, giving him the right to try the question whether the officer is guilty or not, and to remove him from his office."

The counsel for the respondent, while granting this, insist that such removal cannot be made without charges, notice

and an opportunity for defense, and this I consider the important question in the case.

Unless it is the manifest intention of the section under consideration that the proceedings should be ex parte as well as summary, a removal without charges, notice and an opportunity for defense cannot be upheld. The exercise of such power, in such manner, would be too despotic for any attempt at vindication in a country which boasts of the utmost liberty compatible with the safety of the state, and is entirely opposed to the genius of our free institutions. I do not think the people, when they adopted this amendment, intended or supposed that they were placing such unlimited power in the hands of any man. If it exists it places it in the power of the Governor, at his mere will or caprice, to remove all the State officers, except legislative and judicial; and to fill their places with his own partisans, thus revolutionizing the whole administration of the State, and defeating the express will of the people who elected him. It is no argument to say it may never be done. It is sufficient to know that it could be done, and that the people, in adopting the amendment, never intended to grant the power by which it might be done.

The history of judicial proceedings shows that it has been frequently the case that officers, invested with the power of removal for specified cause, have attempted its exercise in an ex parte and summary manner, not through any wrong motive, but from a misconception of the method in which such power should be exercised. In *Ramshay's Case*, 18 Ad. & El. (N. S.) 190, it was said: "The chancellor has authority to remove a judge of a county court only on the implied condition prescribed by the principles of eternal justice, that he hears the party accused: he cannot legally act upon such an occasion without some evidence being adduced to support the charges; and he has no authority to remove for matters unconnected with inability or misbehavior; and where evidence has been given in support of them, we think we cannot inquire into the amount of evidence or the balance of evidence, the

chancellor, acting within his jurisdiction, being the constituted judge upon this subject." In *Williams v. Bagot* 3 B. & C. 786, Mr. Justice Bayley said: "It is contrary to common justice that a party should be concluded unheard." The case of *The Queen v. The Archbishop of Canterbury* 1 El. & El. 545, arose under a statute which enacted that a curate, whose license shall have been revoked by the bishop, might 'appeal to the archbishop of the province, who should confirm or annul such revocation as to him shall appear just and proper.' An appeal was taken to the archbishop, who, without giving the appellant an opportunity to be heard, confirmed the revocation. Lord Campbell said: "No doubt the archbishop acted most conscientiously, and with a sincere desire to promote the interests of the church: but we all think that he has taken an erroneous view of the law. He was bound to hear the appellant, and he has not heard him. It is one of the first principles of justice, that no man should be condemned without being heard." Mr. Justice Wightman said "that, ex debito justitiæ, every one has a right to be heard before he is condemned."

An act of Parliament gave authority to the bishop to decide, upon affidavit *or upon his own knowledge*, whether or not the duties of the parish had been inadequately performed, in consequence of the negligence of the incumbent, and whenever it should so appear to his satisfaction he could, by certain proceedings, appoint a curate in place of the incumbent. The bishop, proceeding upon his own knowledge, without notice or an opportunity afforded to the incumbent, adjudged that the duties of the vicarage of the parish were inadequately performed by reason of the vicar's negligence, and proceeded to appoint another person to the place. The incumbent refused to surrender to the new appointee. Lord Lyndhurst held that the language of the act imported inquiry, and a judgment as the result of that inquiry. He said: "He is to form his judgment; it is to appear to him from affidavits laid before him: but, is it possible to be said that it is to appear to him, and that he is to form his judgment from affidavits laid before him on the

one side, without hearing the other party against whom the charge of negligence is preferred, which is to affect him in his character and in his property? That he is to come to that conclusion, without giving the other party an opportunity of meeting the affidavits by contrary affidavits, and without being heard in his own defense—without having an opportunity even of being summoned for that purpose—as in the present instance; there being no summons, for the monition was proceeded in immediately, without any intimation whatever from the bishop of his intention to proceed, to the party against whom that requisition proceeds." And he further held that when the bishop proceeded, " on his own knowledge, the same course of proceeding is necessary; because a party has a right to be heard for the purpose of explaining his conduct; he has a right to call witnesses, for the purpose of removing the impression made on the mind of the bishop; he has a right to be heard in his own defense." *Capel v. Child* 2 Cr. & J. 558.

Under the constitution in force, in 1846, in the state of Kentucky, the secretary of state was appointed and commissioned by the governor to hold his office during good behavior, and to the end of the governor's administration. The governor caused to be entered in the executive journal the following:

"SEPTEMBER 1st, 1846.

Whereas Benjamin Hardin, by his failure, willful neglect and refusal to reside at the Seat of Government, and perform the duties of Secretary, has abandoned said office, and said office, in the judgment of the Governor, has become vacant for the causes aforesaid, it is, therefore, declared by the Governor, and ordered to be entered on the executive journal, that the office of Secretary has become and is vacant. Wherefore, to fill said vacancy, the Governor this day commissioned George B. Kinkead, Esq., to be Secretary till the end of the next General Assembly of Kentucky. And George B. Kinkead having qualified to his commission, entered upon the discharge of his duties."

Here appears quite a similarity between the executive action of the governor of Kentucky and this action of the

executive in this case in the method of proceeding. There was no notice given to Hardin previous to this action of the governor. Chief Justice Marshall, in delivering the opinion of the court said: "The secretary being removable for breach of good behavior only, the ascertainment of the breach must precede the removal. In other words, the officer must be convicted of misbehavior in office. And we shall not argue to prove that in a government of laws, a conviction whereby an individual may be deprived of valuable rights and interests, and may moreover be seriously affected in his good fame and standing, implies a charge and trial and judgment, with the opportunity of defence and proof." *Page v. Hardin* 8 B. Mon. 672. As no judicial power was conferred upon the governor in such case, the court held that the conviction must be had before the judicial tribunals of the state. I should reach the same conclusion in this case were it not that the amendment of 1862 confers judicial power upon the governor to act in the cases specified.

In *Willard's appeal* 4 R. I: 601, it was held that a school committee of a town had power to remove their clerk, for just cause, after hearing, full opportunity having been given to him, upon charges presented, to defend himself against them. In *Commonwealth v. Slifer, State Treasurer* 25 Penn. St. 23, the case was this: The adjutant general holds his office for a specified term, "if he shall so long behave himself well and perform the duties required by law." The statute provided: "Whenever, in the opinion of the governor, the adjutant general fails and neglects faithfully to perform the duties of his office, the governor shall remove him from office." Before the relator's term of office had expired the governor appointed and duly commissioned Thomas J. Power to be adjutant general, the respondent alleging as a reason for this action that the relator had not behaved himself well, and had not performed the duties required by law. No notice was given to relator of his removal, nor opportunity for defense. Chief Justice Lewis said: "No removal is shown or alleged, except that which is implied by the simple appointment of a successor.

\* \* \* We are unwilling to believe that the governor intended, without cause to remove an officer appointed for a term of years, before the term had expired. That he possessed the power of removal is conceded; but the power is to be exercised *upon cause shown.* It exists only where 'the officer fails and neglects faithfully to perform the duties of his office.' It is true that the executive is made the judge; and that his 'opinion' or judgment is conclusive, so far as relates to the question of removal. But that judgment is not to be pronounced without notice, without any charge or specification, and without any opportunity given to the officer to make his defence. The reputation and the right of the incumbent to the office for the term specified in his commission are involved; and he has a right to know the accusation and to be heard in his defence." In *Meade v. Deputy Marshal* 1 Brock. 324, Chief Justice Marshall said: "It is a principle of natural justice, which courts are never at liberty to dispense with, unless under the mandate of positive law, that no person shall be condemned unheard, or without an opportunity of being heard." *Chase v. Hathaway* 14 Mass. 222 was a case where a judge of probate proceeded and entered judgment upon an inquisition of lunacy without notice to the alleged lunatic. Chief Justice Parker said: "There being no provision in the statute for notice to the party who is alleged to be incompetent, by reason of insanity, to manage his estate, it seems that the judge of probate did not think such notice essential to his proceedings. But we are of opinion that, notwithstanding the silence of the statute, no decree of a probate court, so materially affecting the rights of property and the person, can be valid, unless the party to be affected has had an opportunity to be heard in defence of his rights. \* \* \* And whenever the legislature has provided that, on account of crime or misfortune, the public safety or convenience demands a suspension of these essential rights of the individual, and has provided a judicial process, by which the fact shall be ascertained, it is to be understood as required that the tribunal, to which is committed the duty of inquiring and determining, shall give

opportunity to the subject to be heard in support of his innocence or his capacity." See also *Geddes v. Thomastown* 46 Mich. 316; *People v. Lord* 9 Mich. 227; *People v. Ingham County Treasurer* 36 Mich. 416.

The line of authority is not by any means exhausted, but enough cases have been cited to show that the action of the Governor in this case cannot be upheld as a legal and proper exercise of the power conferred upon him. There must be charges specifying the particulars in which the officer is subject to removal. It is not sufficient to follow the language of the Constitution. The officer is entitled to know the particular acts of neglect of duty, or corrupt conduct, or other act relied upon as constituting malfeasance or misfeasance in office, and he is entitled to a reasonable notice of the time and place when and where an opportunity will be given him for a hearing, and he has a right to produce proof upon such hearing. What length of time notice should be given we do not determine; it must depend, in a great measure upon the circumstances of each case.

I have examined carefully the authorities cited upon the brief of the learned counsel for relator in support of the position that no notice is required to be given, and that the action of the executive is final and conclusive. It is sufficient to say, without commenting specially upon them, that the reasoning of those cases does not commend itself to my judgment. They appear to me to be opposed, not only to the decided weight of authority but also to the fundamental principles of justice. In what I have said upon the law of this case I have not cast the least imputation upon the motives of the executive. The same presumptions of good faith and honest desire to act within legal and constitutional limits are accorded to him as to either of the other co-ordinate branches of the government, and his motives are not the subject of criticism. I have no doubt that he acted under the impression that he was entirely within the line of his duty as well as of law, and that he believed that the removal of respondent was demanded by the best interests of the public service.

Be that as it may, the relator has not made out a case for

the intervention of the Court, and judgment must be entered for respondent.

SHERWOOD, J., concurred.

COOLEY, C. J.   I concur both as to the right of the respondent to be heard upon charges, and as to the power of the Governor under the Constitution to decide upon the charges.

CAMPBELL, J.   This suit is brought to charge respondent with unlawfully continuing to act as trustee of the Deaf and Dumb asylum at Flint, it being claimed that on July 2, 1883, the Governor removed him, and appointed relator to succeed him.   The removal relied on was a certificate filed in the Secretary of State's office and a notice to respondent, both dated July 2, 1883, only 23 days after the Legislature adjourned, and reciting the removal to be for "official misconduct and habitual neglect of duty," with a further clause that the reasons would be laid before the Legislature at its next session.   No other designation of causes of removal was given.   The Governor's action was ex parte, and on his own motion, without hearing or opportunity for hearing, and without taking testimony. On this so-called removal of respondent, the Governor appointed relator to fill the vacancy "until the next regular session of the Legislature of said State of Michigan, and until such vacancy shall be filled, according to the form of the statute in such case made and provided."

Respondent claims that the action of the Governor was inoperative, and that his term of office as fixed by law for six years from his appointment in 1881 has not been defeated. The record presents this issue directly, and presents no other issue except that of relator's title.   And respondent's claim is that before the Governor can remove a State officer, appointed or elected for a fixed term, there must be definite charges of such official misconduct as would authorize removal, and the establishment of culpability upon a fair

hearing, upon due notice, before the proper tribunal, whatever that tribunal may be.

It is claimed by relator that the Governor may of his own motion, without hearing and without charges, remove State officers, and that his action is conclusive upon all persons, and cannot be questioned on a judicial inquiry.

But it was suggested on the argument that if the removal is invalid, issues may be framed in this Court, under the proceedings now before us, for charging and trying respondent for malfeasance, so that he may, if found guilty, be removed hereafter, or the old removal be validated by relation. It is enough to say that this Court is not a court of original jurisdiction to try public officers for crime; and that a suit brought to determine whether the respondent was lawfully in office when the suit was begun cannot be changed into a proceeding to try anything else.

And it is further insisted that it is not within the power of the judiciary to review or sit in judgment upon the action of the executive, which must be respected as the act of an independent co-ordinate department of the government, subject to no appeal.

It is undoubtedly true that no court can review the lawful discretion of any body that is not a court, and that the executive stands in this respect on the same footing with all other persons and bodies. But it is equally true that private rights cannot be subjected by legislative, executive, or any other authority, to the unregulated discretion of any one. Legal rights can only be divested by such measures as are classed under the law of the land as due process of law. Courts, in determining whether rights exist, or whether vested rights have ceased to exist, do not act necessarily or usually as appellate tribunals, whose judgments operate on the tribunals or persons whose invasions of right are complained of. They may or may not do so. But in a constitutional government the action of all persons, official or private, which is in violation of constitutional rights, is simply null and void, and usually needs no reversal. And the action of any department of government, whether legislative,

executive or judicial, beyond its jurisdiction, or against the constitutional limitations of its authority, is in law the same as if there had been no action, and cannot be recognized as having legal effect. The legislative authority is the highest of all, and no court could possibly entertain any appeal from it. But it has been uniformly held that an unconstitutional legislative act could bind no one, and that whenever in any cause pending before a court the rights of either party depended upon such action, the court must determine the question. And in England, where Parliament is supreme, and where acts of Parliament can seldom be questioned, the power of the crown is always open to question, and no one can gain or be deprived of rights by prerogative interference, except in strict accordance with the law of the land. No executive authority exists outside of its legal boundaries. 12. Co. Rep. '76; 2 Inst. 36, 63, 496. All offices must be created in accordance with law. Unless they are held during the pleasure of the executive, or subject to removal at his will, he cannot interfere with them, except as the law provides; and if his right depends on conditions, those conditions must be determined in some legal way. No right can be subject. to his uncontrolled discretion.

And where, as is sometimes the case, he has the duty of inquiry and decision, he has no power to decide without a hearing any controversy involving private rights. We are bound in this case to ascertain whether he has acted in accordance with any authority lawfully vested in him, and decide accordingly.

The office in this case is an office granted by the concurrent action of the Governor and Legislature, under a law which fixes its duration at six years. If lost previously, it can only be because it has been forfeited by some conduct which is a legal ground of forfeiture. And this forfeiture must have been ascertained and decreed in a legal way.

The action of the Governor was on the argument based on the Constitution, and upon a statute which was passed while the Constitution of 1835 was in force, being chapter 15 of the Revised Statutes of 1846, which has been reprinted

in the Compilations, and which is undoubtedly in force as to inferior officers of counties and other localities, but which, so far as state officers are concerned, is claimed, and there is no doubt justly, to have been superseded by the present Constitution, if it ever was valid at all.

It is to be borne in mind that the Constitution of 1835 and that of 1850 agree in allowing the Legislature unlimited power as to causes and manner of removing county and other local officers, so that none of the questions of power arise in regard to them. But by this statute the most careful provision is made for specific charges, and full notice and ample opportunity to be heard. The method of taking testimony has always been by some judicial officer, and the alterations in the statute have been chiefly caused by the abolition at different times of the offices of associate and county judges, whereby new officers had to be substituted, who are circuit court commissioners and judges of probate, by whom the testimony to be laid before the governor is to be taken. And it has been uniformly held by this Court that where provision has been made—as under the Constitution it may be for removal of local officers for cause by other bodies—there must be the same definite charges and fair hearing, whether expressly required by statute or not. *McGregor v. Sup'rs of Gladwin* 37 Mich. 388; *Mead v. Treasurer of Ingham County* 36 Mich. 419; *Crawford v. Township Boards of Scio and Webster* 24 Mich. 248; *Stockwell v. Township Board of White Lake* 22 Mich. 341; *Stadler v. Detroit* 13 Mich. 346. And in *People v. Lord* 9 Mich. 227, where it was claimed under the statute before us that the Governor had discretionary power to remove a judge of probate appointed by the executive, we held he had no such power.

These cases are also in point as bearing upon the nature of the power of removal for cause. The power was held to be judicial, and therefore, where exercised by an inferior body, reviewable by certiorari. The Constitution places the general judicial power in courts and nowhere else. But it is competent, by the Constitution, to vest portions of it elsewhere, and this it has done in regard to removals of county

and local officers, by leaving the whole subject with the Legislature.   Removal by impeachment is a strictly judicial proceeding, and one known to the common law as exercised by a court of great dignity for .the trial of nothing but crimes, upon the presentment of the grand inquest of the state, exercising similar functions to those of a grand jury.   If the Governor can, as claimed by relator, pass in person upon charges against State officers for malversation in office, without a conviction elsewhere, under the provisions of the Constitution or of this statute, inasmuch as he is only allowed to do it for causes specified, his action is as distinctly judicial as that of the other removing bodies ; and it must appear on its face to be for definite causes determined upon a legal showing after a due hearing.   A judgment is void which does not show on its face that the judicial body rendering it had both jurisdiction over the person and jurisdiction upon legal charges.

That removals for cause are judicial acts, and that they must be disregarded, whether appealable or not, if not conforming to jurisdictional requisites has been settled so long, not only in this State, but by the common-law doctrines and by the general agreement of courts, that there is no room for serious controversy.

In England Parliament has power to vest any class of powers anywhere it pleases.   In municipal corporations it has usually vested the power to remove officers in some assembly of all or a part of the corporation.   In the case of church officers it is frequently lodged with various church authorities.   In. the case of public officers it belongs to the crown, represented by the chancellor or other high official. Parliament has also the power of providing for the exercise of this power by summary and exceptional methods aside from ordinary common-law procedure, and has done so in some important cases.   In most of these cases there is no appellate jurisdiction anywhere.   But in every case of removal for cause the courts of law have exercised the right of passing upon the legality of the removal, and have invariably treated it as void, unless exercised conformably to the

requirements of jurisdictional sufficiency. And whenever a party unlawfully removed has been actually shut out by his associates or others from acting, a mandamus has issued to restore him, and has been made peremptory unless the proceedings of removal contained affirmative evidence of sufficient charges, sustained on a proper hearing.

It has always been held that general conclusions or conclusions on general charges were not enough, but the facts on which the judgment was based must appear either in specific charges or in specific findings on which the party has been heard on legal proofs. *Rex v. Stirling* Sayers 174; *Rex v. Mayor of Doncaster* 2 Ld. Raym. 1564; *Rex v. Mayor and Aldermen of Doncaster* Sayers 37; *Rex v. Richardson* 1 Burr. 517; *Rex v. Mayor, Aldermen and Burgesses of Doncaster* 2 Burr. 738; *Rex v. Mayor, etc., of Liverpool* 2 Burr. 723; *Rex v. Warren* Cowp. 370; *Rex v. University of Cambridge* (*Bentley's Case*) 1 Strange 557: 2 Ld. Raym. 1348; *Hereford's Case* 1 Sid. 209; *Reg. v. Guy* 6 Mod. 89; *Rex v. Simpson* 1 Strange 609; *Bagg's Case* 11 Co. Rep. 97; *Rex v. Shaw* 12 Mod. 113.

These cases not only require a proper hearing on proper charges, but hold that those charges must consist of distinctly stated facts, and not general charges of wrong or neglect, so that it can be determined, as a matter of law, whether what the removing body treats as wrong is within the legal quality of wrong. This is particularly referred to in 12 Mod. 113 and Sayers 39 and 174, and 2 Ld. Raym. 1564 and Strange 557.

It is also held that the case must appear to have been proved by evidence, and that a mere finding of results on alleged personal knowledge is not enough. *Rex v. Fishers of Faversham* 8 Term 352; *Capel v. Child* 2 Cr. & J. 558.

The necessity of definite conclusion is further exemplified in *Rex v. Pinney* 3 B. & Ad. 947: s. c. 5 C. & P. 254, where it was held that the jury, where an indictment was tried against a Mayor for neglect of duty, could not convict unless all agreed on the same specific act of neglect.

This is not merely ancient doctrine. The safeguards against wrong, and the right to have charges determined by

due process of law, which is distinctly asserted by Lord Mansfield in Burrows, as the basis of these rulings, are as clearly recognized under the grant of special remedies as in any other. The removal of obstacles to the testimony of parties revived the business of the English county courts to such an extent as to render the office of county judge a very important one. The lord chancellor, and in Lancashire the chancellor of the duchy, have been given power to decide summarily and remove "for inability or misbehavior" any such judge. Justices of the peace hold during pleasure, and may be removed at will. But it has been held that any county judge removed by either of the chancellors, although there is no appellate jurisdiction to review the action, has a right to have its legality questioned and determined in a proceeding to try title to the office by quo warranto. This right was solemnly adjudicated in *Ramshay's Case* 10 E. L. & Eq. 445 (18 Q. B. 195), and while it was held that the act of Parliament did not require the chancellor to award a trial by jury, it was further held that the proceedings must have all the requisites of a judicial proceeding, and the courts were bound to see to this. The court adopt as their own the language of Lord Mansfield in *Rex v. Warren:* "He can never be the sole judge and remove him ad libitum, without being subject to the control of this court; the court may inquire into the cause and manner of amotion."

In the case of *Regina v. Owen* 15 Q. B. 476, which arose concerning a removal under the same act of a clerk of a county court for "inability," the question also came up on quo warranto, and it was held open to inquiry, and the cause of inability acted on by the judge and approved by the lord chancellor was held not sufficient as a legal ground of disqualification, and the removal was held void. In this case the defense relied on the want of power in the queen's bench to sit in appeal on the lord chancellor, but it was answered that the proceedings were in no sense appellate.

The fact, then, that the statute and the Constitution, in giving the Governor power to remove, prescribe no methods of examination, can in no way relieve him from the neces-

sity—even if he is to pass personally on the facts—of having specific charges of misconduct communicated to the officer, and established by proof, with a full opportunity to the respondent to examine and cross-examine witnesses, and be heard on the facts and the law.

But it is, perhaps, important to consider the legal character of this investigation more directly, in view of the constitutional provision which must govern.

The Constitution of 1835 contained full express provisions for removing local officers. It contained none for removing State officers except by impeachment, and it confined the judgment there to removal, saving the ordinary criminal remedies for the remainder of the punishment. In that respect it was identical with our present Constitution until 1861, when an amendment was proposed and adopted, as a new section in article 12 of impeachments and removals from office, which thus far had been identical in both, whereby it was provided that when the Legislature was not in session the Governor might investigate the action of public offices and officers, and "remove from office for gross neglect of duty, or for corrupt conduct in office, or any other misfeasance or malfeasance therein," either of the State officers mentioned, and "appoint a successor for the remainder of their respective unexpired term of office, and report the causes of such removal to the Legislature at its next session."

This provision covers every case covered by the statute and several more, because that was only applicable to appointed officers, except such as were named, and all of those were appointive when the statute was passed. It narrows the causes of removal, if the contention of the relator is correct; but in fact the present language, although more definite, is substantially the same in meaning with the former, as construed by the courts. Each of these causes is a well-recognized common-law crime, punishable by indictment, and in the case of officers of state, by impeachment. Russell Cr. L. 14; Comyn's Dig. "Information;" 1 Bish. Cr. L. § 459; *Regina v. Mayor of Rochester* 2 Jur. 64; Const. Art. xii, § 1.

It is also worthy of remark that the statute, when passed

reached no elective officer, and when first passed did not cover the State treasurer, in whose selection the Governor had no choice. Moreover, at that time the State officers named held office for two years from the date of their appointment, and not as now for fixed periods, so that a new appointment in the regular way was never to fill an unexpired part of a term. Further than this there was then no term of office which did not include two regular annual sessions of the Legislature, which at present sits but once in two years. Now any officer misconducting, during a recess of the Legislature, in any of the chief executive offices, is safe from impeachment unless there is an extra session. If the statute was really intended to effect absolute removals from office, and not merely suspensions, it did not contemplate that the Governor could fill the vacancy for a period which would exempt both himself and the officer removed or appointed from responsibility to the next Legislature. As it is manifestly not in force now, it is unnecessary to inquire where it came from or how far if at all, it was valid. But the nature of the act of removal may have some bearing on the meaning of so much of it as resembles the constitutional provision.

It has already been said that all the acts on which the Governor can proceed are indictable offenses. It is equally well settled that every removal from office for wrong-doing is in law a punishment for crime. It is the only punishment which an impeachment court can now inflict, and impeachment trials are strictly criminal trials. The Court of Queen's Bench, while recognizing the absolute power of Parliament over procedure, felt themselves in some difficulty in determining that a county judge or clerk could be deprived of trial by jury, even where not charged with crime, and in *Ramshay's Case* took pains to consider whether that form of trial was to be regarded as omitted. But in *Regina v. Marshall* 30 E. L. & Eq. 204, it was distinctly decided, not only that the offense was indictable, but also that the application to the chancellor was a proceeding which would preclude the complainant from asking a criminal information, because "it was an application to try and to punish," and the two

would amount to a double vexation for the same cause.
And the court, on the suggestion that the chancellor might
decline removal until conviction by indictment, declared
that "such a course would be in accordance with the rule
laid down by that great judge, Lord Chancellor Eldon, not
to remove a justice of the peace from the commission until
after a conviction upon a criminal information."

The same view was taken in New York, in *Barker v.
State* 3 Cow. 686, affirming the action of the supreme court
in sentencing the respondent to be barred from holding
office as part of the penalty for dueling. He claimed that
it was not competent for the legislature to impose such dis-
qualification, because it did not come within the definition of
punishment at common law, and must be regarded as such
an "unusual" punishment as was forbidden by the consti-
tution. And he claimed that the sentence of removal on
impeachment was not a criminal sentence, but a proceeding
not bearing that character. But the court held that removal
was a well-recognized punishment for official crime, and that
the power on impeachment to give such a sentence, instead
of being a new remedy, was only a portion of the old pun-
ishment, the English house of lords having authority to
inflict every kind of punishment appropriate to crime, while
the American senates can only inflict a part, the constitution
itself saving a further remedy by fine or imprisonment.

Our former and present state constitutions take the same
view. By the Constitution of 1835 it was declared that "No
person shall be held to answer for a criminal offence, unless
on the presentment or indictment of a grand jury, except in
cases of impeachment," and some petty or military offenses.
Article 1, § 11. By the previous section it was provided
that in all criminal prosecutions the accused should have a
speedy and public trial by jury, with the other familiar safe-
guards which need not now be dwelt upon. Our present
Constitution does not require a grand jury, but it preserves
all the other precautions.

We have also in the same direction the recognized doctrine
that while the proper assembly of a municipal corporation

may remove an officer not only for violations of by-laws and corporate order, but for crimes rendering him unfit to be retained, yet they cannot try the criminal charge, or act upon it until conviction by a criminal court.    2 Kyd Corp. ch. 3, § 9; *Rex v. Lane* 1 Mod. 370; *Rex v. Richardson* supra.

Not only was our own Constitution of 1835 adopted when *Barker's Case* was very familiar, but the New York provision of disqualification for dueling was put into our first Revision and has been retained ever since.    It is also significant that in the same chapter of the statutes under which the Governor attempted to act, the only cause of loss of office arising from misconduct is, not the commission, but "his conviction of any infamous crime, or of any offense involving a violation of his oath of office."    Comp. L. § 617.

Considering the fact that neither constitution gave any authority until 1861 to remove state officers at all, except by impeachment, and that conviction of crime might always be ground of removal by proper steps at common law, and considering the further fact that the legislation in question gave very precise remedies for the removal of inferior officers, and gave the Governor no machinery whatever for examining the more serious cases of officers of State, the natural inference should be that he should act on such evidence and by such means as the law itself furnished—namely, a criminal conviction, which is matter of record and open to no dispute. It is difficult to see any other method open under the Constitution, which required all crimes to be tried on impeachment or other legal form of accusation.

The impossibility of sustaining the Governor's action here will further appear by comparing its necessary results with the rest of our constitutional scheme of government.    If he could remove respondent as he did, it is only because, as is freely admitted by counsel, the restrictions on his power are not obligatory, and his only restraint is his sense of propriety; or, in other words, he has unlimited discretion to do as he pleases.    No legislative session can be called during his term of office except by himself; and the removal enables him to appoint for the whole remaining term of office, so that his

nominee could only be displaced by his successor, acting under the same absolute power, and in such offices as are most important, and are held by terms of two years, could not be removed at all. If this can be done every officer of the government may be removed as soon as the Legislature adjourns, and every office can be filled by the Governor's nominees, and the whole elective system will be annulled.

If this were so, it is very difficult to imagine why these offices were not made in name, as well as in fact, offices at the will of the Governor, as they might have been had it been thought proper. But a contrary design is manifest throughout. The conditions of removal are express and clear, and cannot be regarded as immaterial. Every office is made for a fixed term. No officer of State could ever, even under the old Constitution, be appointed by the Governor alone, and the custodian of the public funds was under that chosen by the Legislature without giving the Governor any voice in the matter. Yet, with all these restrictions, it was afterwards determined to make every constitutional State office, executive or judicial, entirely independent of both Governor and Legislature, and all were made elective, first by an amendment of the old Constitution in 1849, and afterwards by our present Constitution in 1850.

Furthermore, it is not within the power of the Legislature itself to remove an officer for misconduct, except by impeachment, or to impeach any one who is not actually in office so that he can be removed. It may remove judges, but no one else, for causes not involving criminality, by a two-thirds vote and the consequent action of the Governor. But it cannot condemn any one by bill without trial, as might be done by parliament, because such legislation is forbidden by both the federal and State constitutions. It would be nothing short of absurdity to claim that any purpose was entertained, when the Amendment of 1861 was adopted, of confining the legal rights of the elected officers of the State to the brief period of a session of the Legislature, leaving it open to the Governor to fill all the offices for the remainder of his own two-

years term.   And the Amendment does not sanction such an interpretation, according to the rules of legal construction.

The evident purpose of the Amendment was to provide that the Governor should have power during the recess to secure the removal of such persons as would be legally impeachable during the session.   The Constitution had already provided how official crimes should be tried, giving the double remedy of impeachment and indictment, or other criminal prosecution.   It might have created special tribunals, or authorized them to have been created.   It has not done so.   It has not given the Governor any means of trying crime, but only the power of removing when crimes have been committed.   And it has provided the same means for determining that crimes have been committed that have been found adequate under the common law, namely, the criminal courts that are expressly referred to as having all the powers of a court of impeachment except that of pronouncing sentence of removal.   As held in *Barker's Case*, and as indicated by our own statutes, that power might also have been given, but inasmuch as the Governor can pronounce it, the court and the Governor combined can do in the recess precisely what might have been done in the session, and in no other way can the result be reached without disregarding the constitutional rights of trial by jury or by impeachment.

There is no foundation in English law for any removal from public office which is not held at will, without a trial by jury, except where parliament has provided some other mode of trial.   A scire facias is necessary to enforce a forfeiture of office held by patent where the ground falls short of official criminality, and is a breach of some express or implied condition.   Com. Dig. (Patent F, 3.)   But a misdemeanor against the duties of office is also ground of forfeiture, and the pendency of an indictment was ground for an information, and on conviction of the offense the crown might seize the office.   Dyer 151.   If there can be any other way of trying criminal charges of malversation, a somewhat careful search has failed to discover it.

It is not satisfactorily shown that any different doctrine

has ever prevailed in the United States, except in some iso-
lated cases, and it would require a unanimity of decision,
amounting to an entire removal of the old land-marks, to
justify the recasting of constitutional principles which under-
lie our whole system. In addition to the cases cited on the
hearing, the case of *State v. Pritchard* 36 N. J. Law 101
contains an instructive discussion of this subject. The deci-
sion in *Collins v. Tracy* 36 Tex. 546, also appears at variance
with what counsel for relator seemed to regard as the law of
that state.

In any point of view, and whether the Governor is or is
not vested with judicial powers of trial as well as removal,
there is no rule which will sustain his present action as con-
forming to legal principles.

In my opinion judgment should go for respondent.