Foilett, J.,
dissenting. My reasons for urging the con-
stitutionality of this police statute are sufficiently set forth in the opinion in "the case of The State ex rel. Attorney-General v. Hudson, infra, 137, but I dissent from the holding of the majority of the court on other propositions here, viz.:
That the governor had ample power to pass upon the official conduct of the board of commissioners, and to remove them from office if he deemed them guilty of “ official misconduct;” and that the power of removal was properly exercised here.
I shall set forth some reasons for my dissent. The facts should be known.
On April 4, 1885, the board of public works of the city of Cincinnati appointed as a board of police commissioners of that city Will. A. Stevens for the term of one year, Julius Reis for the term of two years, and Morton L. Hawkins for the term of three years, from the eighth day of April, 1885. They entered upon the discharge of their duties, and performed the same until February 3,1886, when, it is alleged, they were removed by the governor. They denied the validity of the removal and retained their offices, and this action is here for a judgment of ouster. The defendants answer, and the relator by his demurrer admits the answers and allegations therein to be true.
These show that, on January 24,1886, charges were preferred against all the police commissioners. These charges set forth their appointment, and that they had vested in them all police powers and duties connected with the police force of the city of Cincinnati, and that for official misconduct they or either of them could be removed by the governor. They charge, as official misconduct, that, on August 25, 1885, they made an order on their minutes “ that Michael Mullen be reinstated to his position of lieutenant, to take effect at once,” Hawkins and Reis voting aye, and Stevens voting nay; and that, October 2,1885, by the same vote, Mullen was promoted to be inspector of police; that Mullen, at the October term, 1884, of the circuit court of *119 the United States, held in Cincinnati, was indicted for preventing certain citizens from voting at an election for representatives in congress, such persons being entitled to vote at that election; that such offense was committed while Mullen was lieutenant of the police force of the city of Cincinnati, and was in charge of the Hammond street station-house in the city; that he was found guilty, and he was sentenced to be imprisoned in the jail of Hamilton county for twelve months, and to pay the costs of prosecution.
No part of the testimony is given, but they contain what purports to be certain remarks of the judge. The charges averred that the board of commissioners knew what Mullen had done, and that he was so found guilty and sentenced.
They further charged that, on October 17, 1885, by the same vote, the board appointed one John Tosney as a patrolman of the force; and that, when appointed, he had been arrested upon the charge of stuffing the ballot-box and violating his duties as judge of election of precinct A of the Fourth ward, October 13, 1885, and that the board knew the same; and that the board unanimously, on August 14, 1885, had dismissed Tosney from the force for drunkenness.
They also charge that, October 17, 1885, the board suspended, and on October 27, 1885, dismissed from the force one Herman F. Newman, and allege that his dismissal was without cause and in violation of official duty; and that he was dismissed because he had discharged his duty and had arrested Tosney.
The charge states that the police commissioners have appointed and kept on the regular police force a large, number of men wholly unfit to act as police officers.
They charge that, on October 13, 1885, and for some days prior thereto, the- board appointed a large number of special policemen, who were wholly unfit to act as such officers, as was well known to the board, and name a large number of men.
*120 That there was an organization in the city of Cincinnati to secure an honest and fair election, known as the committee of one hundred, and this committee, before the election of October.18, 1885, caused warrants to be issued for violations of the registry law and other offenses, and a subcommittee of that committee waited on the police commissioners and told them of the same and 'urged their arrest, and that they willfully refused to discharge their duties and arrest such accused persons; and that the board failed to take steps to secure an honest election.
The charges thus conclude: “ Wherefore your petitioners ask that said Morton L. Hawkins, Julius Reis, and Will. A. Stevens, be notified of the charges filed herein against them for official misconduct; that they be afforded time to file any answer they may desire to make to said charges ; that a time be set for a hearing of the same; and that your excellency may take such action in the premises as the testimony in the case may warrant; and that, if said police commissioners be found guilty of the charges herein, they may be removed from their said office.”
These charges were signed by an ad interim committee of the committee of one hundred,. January 23,1886.
It is plain to see that .this committee thought the governor possessed sufficient judicial power to try these charges, and that a decision as to whether or not either of the police commissioners was guilty of official misconduct would depend upon the testimony in the case.
On January 25, 1886, a copy of these charges was served upon each of the police commissioners, and February 3, 1886, at the governor’s office in Columbus, was set “ for the hearing of the same at this office upon such testimony as may then be offered in support of or against said charges.”
Hawkins was too sick to attend to business and asked for time to answer. Reis and Stevens each filed a separate answer. Reis admitted that he was police commissioner, and he denied the governor’s jurisdiction over the matters charged, and he denied “ each, all and every statement set *121 forth in said charges,” and he denied that he had been guilty of any official misconduct or had failed to discharge the duties of his office or had improperly discharged the duties imposed upon him.
He admitted that he voted for the appointment and promotion of Michael Mullen, that Mullen was indicted and convicted as charged, and he averred that Mullen, prior to the charges for which he was indicted, had been a faithful and efficient officer of police, and that he, Reis, was informed at the time of the conviction of Mullen that the facts were as follows: that Mullen in the discharge of his duty as lieutenant of police, having received an order from the mayor to arrest all suspicious persons, and having received information that a large body of persons were congregated at certain places in the city of Cincinnati on the evening before election day, not legal voters in the city, but non-residents of the county and statej who had come to Ohio for the very purpose of violating the election law's to be held upon the following day; and in purpursuance of the information so brought to him, and in obedience to the order so received from the mayor, arrested a large number of said alleged illegal voters in good faith and for the purpose of carrying the election laws of Ohio into effect, and to prevent illegal voting. That inadvertently in making the arrest of so large a number of persons, there were included therein three or four persons who were legal voters, found in the company of the assemblage of persons so congregated together for the purpose of violating the law, and that whilst technically guilty of the crime charged against him in the court, he was innocent of all purpose of practicing a fraud upon the rights of any one entitled to vote.
That after conviction and he had served a portion of his sentence he received from the president of the United States, a full and complete pardon for the offense charged ■against him. And that he, Reis, believed such a pardon blots out the offense so that it can not be imputed to the one pardoned. And he referred to Knapp v. Thomas, 39 *122 Ohio St. 381, where Okey, J., says, “by force of the pardon . . . he was restored to all his civil rights and privileges. A pardon reaches both the punishment prescribed for the offense and the guilt of the offender. Exp. Garland, 4 Wall. 333, 380. It obliterates, in legal contemplation, the offense itself.” That he, Reis, believed he should so act, and that in view of the previous good character of Mullen in that community and in view of his efficiency as a police officer, etc., he voted as he did. That since then Mullen so conducted himself in his office and so effectively performed his duties to the satisfaction of the citizens of Cincinnati, that he voted for his promotion, and respondent believes Mullen has ever since conducted himself as an orderly, well-behaved and competent police officer; and that in voting for Mullen he did so with the single and sole purpose of performing his duty as he was bound in law to do.
As to Tosney he denied that he knew of any thing against him, except at one time drunkenness, when he was dismissed; and that before he was reappointed he heard he had reformed, and his reappointment was asked for by many respectable and influential citizens; that he did not know that Tosney had been accused, or was a judge of election.
That the dismissal of Newman was not without cause, and he denies it was in violation of the duty imposed upon him as police commissioner, or that it was occasioned by the arrest of Tosney by Newman, and denies that Newman was discharged because he performed his duty; but he avers that Newman was inefficient, was complained of by his superior officer and was discharged from the force for good cause, and specified times when he remained away from duty when needed, and when he engaged in a brawl in a public saloon., specified when he had been guilty of several offenses, had been arrested for an assault on an old man, and had been charged with intoxication and insubordination, and that for an attempt at blackmail Newman was dismissed by the republican board of public works, and *123 that the best interests of the police department required his dismissal from the force.
That respondent denies specifically many other things charged; and then also as to "White, he says that White has served eight years under different mayors, and that so far as. he has been advised or had knowledge, "White has been a vigilant and useful officer for the past eight years. That the board requested the sub-committee of one hundred to furnish the board the names of one hundred persons to act as a special police at the election, but they furnished only twenty-seven names all of whom wore appointed. That he swore in but one person as policeman, and he served in a court room. That at the request of members of the committee of one hundred he went to the rooms of the police commissioners at the appointed time, and that he found the sub-committee leaving the building, and that on inquiry of "W. P. Anderson, one of the sub-committee, he was told by Anderson that, “ it is all arranged; it is all right,” and he knew nothing further of arrests until charges were promulgated against superintendent Hudson in relation thereto; and he refers to the transcript of a case against Hudson, superintendent of police, wherein the whole subject set out in charge No. 6 was tried, all the evidence bearing on it was heard, arguments of able counsel were made at length, and an opinion rendered by Judge Fitzgerald fully exonerating Hudson.
Stevens denies all, except that he was such officer. He avers the sickness of Hawkins, and that, on February 1, 1886, it was represented to the governor that the answer of Hawkins could not be filed for the reason that he was so ill that his physician forbade his consulting with his attorneys at that time. Thereupon it was agreed, with the consent of all present, and was so directed by the governor, that on February 3, 1886, the answer of Reis should be filed, and the answer of Hawkins should be filed at that time in case his counsel could prepare it in his absence, but in the event of his inability to confer with his counsel, or if not filed by reason of his sickness at that time, the gov *124 ernor then and there agreed that he would allow further time for the answer of Hawkins to be filed.
That counsel for Stevens then stated to the governor that an important professional engagement required his absence from the city. That the governor then and there agreed that the charges against Stevens should not be set for hearing at any earlier day than the first Tuesday following February 3, 1886, to wit, February 9, 1886. With that understanding the counsel for Stevens left tbe city and l’emained away until the Monday following, relying on the good faith of the governor that no action against Stevens would be taken until February 9th. During this time Stevens was sick with typhoid fever. On February 3,1886, without hearing any testimony, without trial, and without any investigation of the truth of the charges, all of which were denied and put in issue by the answer, the governor made the order on the executive minutes of the state of Ohio, a true copy of which he attached to his answer. All this is admitted by the demurrer. Also, Stevens avers the same as Reis about the charge as to Tosney, and as to Newman, and as to most of the other charges. As to White, Stevens says, that when he was appointed on the board of police commissioners, White had been serving some eight years as police officer detailed to special duty, and that he was a vigilant and useful officer, that it was true that White had been in the penitentiary in 1877 for the violation of the election law in 1876, and that president Hayes pardoned White before half his term of thirteen months was served, but that he did not know of his being in the penitentiary until these charges were filed.
That thereupon the governor issued this order :
“ Office of the Governor, February 3,1886.
“In the matter of the charges and specifications against Morton L. Hawkins, Julius Reis, and Will. A. Stevens, police commissioners of Cincinnati: Ordered by the governor this third day of February, 1886, certain charges and specifications of official misconduct having been preferred *125 against M. L. Hawkins, Julius Reis, and W. A. Stevens, police commissioners, which charges and specifications were duly filed in this office on the twenty-fifth day of January, and a copy of said charges and specifications having been served on each of said commissioners on January 27th, together with a notice óf the filing of the same in this office and that they (the said commissioners) would be given until January 30th to file answers or any other pleadings they might desire to make to said charges and specifications, and that the same would thereafter be heard at this office on February 3d; and said Will. A. Stevens, having filed an answer, and said Morton L. Hawkins and Julius Reis having applied on that day for further time, to wit, until the third day of February, in which to file answers, and for a postponement of hearing until the 10th of February, and having filed, in support thereof, their respective affidavits.
“After hearing the said application, and further time for filing answers having been granted, and further hearing of the application for postponement until the 10th for hearing said charges having been continued until after the filing of their answers on the third day of February, and said matter coming on this day to be further considered, and it appearing that said Julius Reis has filed his answer to said charges, and that Morton L. Hawkins has failed to do so, and it further appearing from examination and consideration of said charges and specifications and answer thereto of Julius Reis, and from the affidavit of M. L. Hawkins that they, the said Reis and Hawkins, do each admit the appointment by them to a position on said police force of Mike Mullen, and also his subsequent promotion by their votes, as alleged in the charges-aforesaid, and the said Mike Mullen being known to the governor as a man of notorious bad character and wholly unfit to hold any position on the police force, and it further appearing from the answer of W. A. Stevens that James S. White and others known to the governor to be men of notorious bad character and wholly unfit to hold any position, are holding *126 positions on the same force and are continued there by his authority, consent, and approval, and it being in the judgment of the governor gross official misconduct to appoint and continue on said force such unfit and improper men, and this official misconduct being as aforesaid admitted by each and all said police commissioners in manner and form as above stated, and no investigation or hearing, and no exercise of judicial power being necessary to the finding and establishing of the fact of said official misconduct, it is considered by the .governor that the applications for further delay should be and hereby are overruled, without regard to other charges and specifications.
“Said Morton L. Hawkins, Julius Reis, and Will. A. Stevens should each and all of them be, and they are hereby, removed from their said office of police commissioners of Cincinnati.
“In testimony whereof, I have hereuuto set my name and great seal of the state, to be affixed at the city of Columbus, this third day of February, 1886.
[Signed,] “J. B. Foraker,
“ Governor of Ohio.”
The answers filed are full, and they are undisputed, and clearly show that each police commissioner had conscientiously and faithfully performed his official duty. If any averments of the answers had been denied, testimony and*a full investigation by any competent and honest tribunal, could not injure good government, or the best interests of Cincinnati, and it might expose the wrong-doers and the criminals. If there was jurisdiction, why was a trial refused ? By removing the commissioners, the police force was crippled, but not one of the police force was removed.
To justify his act, the governor says, “ Mike Mullen being known to the governor as a man of notorious bad character, and wholly unfit to hold any position on the police force.” And he says identically the same thing of White. But his remarkable statement is, “ and no investigation or *127 hearing, and no exercise of judicial power being necessary to the finding and establishment of the fact of said official misconduct.” He seemed conscious that he has no judicial power, and he assumed “ official misconduct,” and refused a trial. Why then the numerous charges, and why a call for answers, and an agreement that a defense to refute the charges might be made? Such acts were not a trial or a finding.
In argument, and to impress the conclusiveness of Reis’ answer to the charges and the answers here, ex-governor Hoadly claimed that he had investigated the charges against Mullen, and fouud that Mullen, under orders, had arrested some one hundred and forty or one hundred and fifty men believed to have been brought into Ohio to put illegal ballots into the election boxes on the next day, and he thought Mullen, by his timely acts had prevented the deposit of hundreds of fraudulent ballots, and for such act he thought Mullen entitled to the commendation of all good citizens. And he thought the president so found when Mullen was pardoned. I know of no law preventing George Hoadly from being a witness to tell the governor what the facts were, and how the facts could be ascertained.
It is absurd to claim that the governor's knowledge of the bad character of any appointee of the police commissioners brings home to any commissioner official misconduct.
It seems incredible that the committee preferring the charges were willing that this man Newman should be branded with such charges as are specified in the answers of Reis and Stevens, and that the committee should not be allowed to clear him with evidence, if they could do so. Had the answers to the charges been denied, then justice to all parties would have demanded a full and impartial trial of the entire matter.
The answers to the charges being true, what was left; of the charge of official misconduct ? If any thing was left, the accused must be found guilty of the “ official misconduct” charged. When guilt is denied, as here, such finding must involve a trial by some competent tribunal where *128 there is a charge, testimony, deliberation and determination. This power is judicial. “ Judicial includes the deciding upon a question of fact, viz: whether the alleged act has been committed; and upon a question of law, viz : whether the inquiry was material” — here was it official misconduct? See People v. Keeler, 39 Hun. 590. It is judicial to hear, adjudge and condemn. People v Keeler, 99 N. Y. 463, 484.
It is admitted that at common law the power to remove an officer for official misconduct, could only be exercised by the courts.
These police commissioners were not appointed by the governor, they were holding office for a definite period of time, their successors were to be elected by the electors of the city, they could be removed only for official misconduct.
In Page v. Hardin, 8 B. Mon. 672, the court says, “ The secretary being removable for breach of good behavior only, the ascertainment of the breach must precede the removal. In other words, the officer must be convicted of misbehavor in office. And we shall not argue to prove that in a government of laws, a conviction whereby an individual may be deprived of valuable rights and interests, and may, moreover, be seriously affected in his good fame and standing, implies a charge and trial and judgment, with the opportunity of defense and proof. The law, too, prescribes the duties and tenure of the office, and thus furnishes a rule for the decision of the question involved. Such a proceeding for the ascertainment of fact and law, involving legal right, and resulting in a decision which may terminate the right, is essentially judicial, and has been so considered here and elsewhere. By the common law, the forfeiture of an office held by patent or commission, was enforced by scire facias, and the judgment of the court. The trial of an impeachment is universally regarded as a judicial function, and the senate, sitting for the purpose, as a judicial body. Similar proceedings (for the removal of officers) in the county or other courts are held to be judicial. And we do nót doubt that every proceeding for the re *129 moval of an officer for cause, that is, for official misbehavior, is essentially an exercise of the judicial power of the commonwealth, and would, therefore, refer itself to the judicial department of the government, if not otherwise disposed of by the constitution or the laws.”
The court go on to say that the constitution and laws have vested this power in the senate sitting as a court of impeachment, and that that tribunal alone can remove an officer for misconduct.
This case was followed with approval in State v. Pritchard, 36 N. J. Law, 101, in which, although the police commissioners of Jersey City had been convicted, on indictment, of conspiring to defraud the city, it was held that the governor had no power to remove them from office.
See also, Dullam v. Wilson, 53 Mich. 392, for a full discussion of the subject, and there the court hold, “In the absence of express constitutional authority, the legislature can not confer on the governor power to remove state or county officers, arbitrarily, and without hearing.”
No one has claimed that in the division of powers by our constitution, such power is conferred upon the legislature, or appertains to the office of the executive.
As to the constitution of the United States, Story, in his Commentaries, § 1537, says : “As the tónure of office ef no officers except those in the judicial department is, by the constitution, provided to be during good behavior, it follows, by irresistable inference, that all others must hold their offices during pleasure, unless congress shall have given some other duration to their office.”
If held during pleasure, the duration may be ended without trial, but the judges of the United States hold their offices during good behavior, and the president can not end that duration Neither can the president remove from office a judge who appoints as clerk of the court a man whom the president knows “ to be of notorious bad character and wholly unlit to hold any position ” as clerk.
*130 No judicial power is conferred on the governor of Ohio by the constitution.
• “Such powers as are specially conferred by the constitution upon the governor, or upon any other specified officer, the legislature can not require or authorize to be performed by any other officer or authority; and from those duties which the constitution requires of him he can not be excused by law. But other powers or duties the executive can not exercise or assume except by legislative authority, and the power which in its discretion it confers it may also in its discretion withhold, or confide to other hands.” Cooley Const. Lim. *115.
Whatever discretionary power the governor has must be given him by the constitution, and this power of removal is not given by the constitution, and other duties, given by legislative act, are not at his arbitrary discretion.
In the opinion of the case of The State v. Chase, 5 Ohio St. 535, Bartley, C. J., says : “ However the governor, in the exercise of the supreme executive power of the state, may, from the inherent nature of the authority in regard to many of his duties, have a discretion which places him beyond the control of the judicial power, yet in regard to a mere ministerial duty enjoined on him by statute, which might have been devolved on another officer of the ¡state, and affecting any specific private right, he may be made amenable to the compulsory process of this court by mandamus.
“ Under our system of government, no officer is placed ¡above the restraining authority of the law, which is truly ¡said to be universal in its behests — ‘ all paying it homage, the least as feeling its care, and the greatest as not exempt from its power/ ”
Calling the power “ administrative ” does not make it discretionary or change its character.
If judicial power were giveu and rightly exercised, the act might be final as the act of a court of last resort, or, if it.were an act of official discretion, then it might be final. *131 The governor says he did not exercise judicial power, and no oue claims the power is merely discretionary.
If the governor could possess the power of removal, he was bound to hear testimony and give an opportunity to be heard.
In Ex parte Ramshay, 18 Q. B. 190, Lord Campbell, U J., says: “ The chancellor has authority to remove a judge of a county court only on the implied condition prescribed by the principles of eternal justice that he hears the party accused.” See Osgood v. Nelson, 5 Eng. & Ir. App. 648, and Commonwealth v. Slifer, 25 Pa. St. 28.
The same point is decided in Dullam v. Willson, supra, where Champlin, J., delivering the opinion of the court, says : “ There must be charges specifying the particulars in which the officer is subject to removal. It is not sufficient to follow the language of the constitution. The officer is entitled to know the particular acts of neglect of duty, or corrupt conduct, or other act relied upon as constituting malfeasance or misfeasance in office, and he is entitled to a reasonable notice of the time and place when and where an opportunity will be given him for a hearing, and he has a right to produce proof upon such hearing. What length of time notice should be given we do not determine; it must depend in a great measure, upon the circumstances of each case.
“ I have examined carefully the authorities cited upon the brief of the learned counsel for the relator in support of the position that no notice is required to be given, and that the action of the executive is final and conclusive. It is sufficient to say, without commenting specially upon them, that the reasoning of those cases does not commend itself to my judgment. They appear to me to be opposed, not only to the decided weight of authority, but also to the fundamental principles of justice.”
Chief Justice Cooley concurred. There was no dissent, but Campbell, J., in a concurring opinion, says: “ That removals for cause are judicial acts, and that they must be disregarded, whether appealable or not, if not conforming *132 to jurisdictional requisites, has been settled so long, not only in this state, but by the common-law doctrines and by the genera! agreements of courts, that there is no room for serious controversy.”
That this court will inquire, on quo warranto proceedings, whether or not an officer has been removed from office, is settled in Ohio, and has just been exercised in the case of The State ex rel. Attorney-General v. Hudson, infra, 137.
Section 6 of article 10 of the constitution (referred to in the majority opinion) shows the policy of our law. That provides: “Justices of the peace, and county and township officers, may be removed, in such manner and for such cause, as shall be prescribed by law.” Not only the cause must be prescribed, but there must be prescribed the manner of proceedings to establish the cause, and the manner of removal. Then a claimed removal may be inquired into. This is shown also by § 1976 of the Revised Statutes, providing for cities of the second grade of the-first class (Cleveland), and which was enacted in 1876, the year preceding the passage of this original act, which was 1877. Section 1976 provides: “Either of the commissioners of police may at any time be removed by the city council, upon good cause being shown, three-fourths of all the members concurring; and where charges are made against a' commissioner, he shall have an opportunity to present evidence and be heard in his behalf.”
Also, in a general provision in § 1685 of the Revised Statutes, it is enacted that, “in no case shall such removal be made, unless a charge in writing is preferred, and an opportunity given to make defense.” For a defense there must be a tribunal with sufficient judicial power to try the case ; and such trial may be inquired into. Any other course is outside of a government by law.
In The State v. Harmon, 31 Ohio St. 250, relied upon in the majority opinion, which was a proceeding in quo warranto, the question involved the constitutionality of the act conferring on the senate authority to try the contested election of a common pleas judge. White, J., says: “The *133 constitution itself plainly recognizes the separation of the authority to try contested elections, from the judicial power which is required to be vested in the courts. Section 21, article 2, is as follows: ‘The general assembly shall determine by law before what authority, and in what manner, the trial of contested elections shall be conducted.’ ” The court does not hold that the power to try such cases is not judicial poioer, but it only holds, it “is not judicial power within the meaning of section 1, article 4, of the constitution, which requires the judicial power of the state to be vested in the courts.” There must be a trial, by a competent tribunal, in a prescribed manner.
In Patten v. Vaughan, 39 Ark. 211, cited and relied upon in the majority opinion, the court held: “In the absence of constitutional or legislative restriction, where no definite term of office is prescribed by law, the power of removal is incident to the power of appointment.” That can not apply to this case. The commissioners were not appointed by the governor, and their term of office was prescribed.
And, in another ease relied upon, State v. Doherty, 25 La. Ann. 119, Wyly, J., says, “The law provided that the governor might make the appointment, and for a certain cause remove the officer appointed by him. Here the law invested the governor with a discretionary power, which' could alone be employed by him.” Such cases do not sustain propositions 2 or 3 of the syllabus; neither does any former decision of this court.
Examine other cases cited and relied upon by the majority, and note what support, if any, is given to this case. In the matter of Cooper, 22 N. Y. 67, appellant appealed from an order, made at a general term of the supreme court, denying appellant to be admitted to practice as an attorney and counsellor at law. The court held, “ In the admission of attorneys and counsellors, the supreme court acts judicially. The function is not of an executive character.”
In Keenan v. Perry, 24 Tex. 253, the governor had appointed for an indefinite term, and the court says, “ The continuation in office of the superintendent of the lunatic *134 asylum, was determinable at the pleasure of the governor.”
In Taft v. Adams, 3 Gray, 126, the court held, “ The legislature have the power to shorten the term of office of any officer, the tenure of whose office is not fixed by the constitution.”
In Ex parte Wiley, 54 Ala. 226, the county solicitor had been suspended from office by a court, and the court held, “The court acts ex mero motu, and of its own knowledge, under the provisions of the statute.”
In Thompson v. Holt, 52 Ala. 491, a probate judge failed to give a required bond, and the court held, “ the failure to give the bonds required is the voluntary act of the judge himself, and the vacancy thereby-occasioned, when enforced against him, is in no legal sense a ‘ removal from office,’ within the meaning of the constitution, or otherwise violative of its provisions.”
In State v. Frazier, 48 Ga. 137, a tax-collector’s commission had been vacated on his failure or refusal to account for public moneys, and when such fact exists it was a “sufficient reason for vacating any office held by such person,” and when such fact existed the governorcould remove.
In Dougan v. District Court, 22 Am. Law Reg. (N. S.) 528, the court held, “Where a statute authorizes an administrative or ministerial body (as the council of a city) to appoint an officer to hold during its pleasure, such body can remove in its discretion, and the exercise of such discretion can not be controlled or restrained by the courts.”
In State v. McGarry, 21 Wis. 496, power was given the supervisors of the county to remove the inspector of the house of correction, for “ cause satisfactory to the board,” and the court held, “ under that act the board may remove without examining witnesses under oath, or giving the officer previous notice of the investigation of charges against him.” But an investigation must show cause satisfactory to the board. So, in State v. Prince, 45 Wis. 610, the county board of supervisors may remove the clerk of such board “ if, in the opinion of said board,” there “ shall be a *135 sufficient cause for such removal,” “ but an appeal lies to the circuit court from the order of removal.”
Donahue v. County of Will, 100 Ill. 94, was the removal of a county treasurer by the county board, and finding that the treasurer had not settled and accounted for moneys as required by law, and had been and was in arrears with the county; and the court held, “ if the court finds that the inferior body had no jurisdiction, or exceeded' it, or had not proceeded according to law, it should quash the proceedings shown by the return.”
I fail to find in these cases justification for propositions 2 or 3 of the syllabus. Charges, ample in statement but false in fact, may be preferred; and, on notice, answers clearly refuting the charges may be given, and undisputed evidence offered to prove the charges false and the answers true ; and the l’ecord may show that the governor had not proceeded according to law, and had refused a trial or hearing; and the record may also show, the governor said he removed the officers for no act of theirs, but by reason of his estimate of the character of other parties, their ap-^ pointees: all this would not remove the officers.
The record might show there was no “ official misconduct,” and no proper proceedings, and that all was void. We are asked to presume against the statements of the record.
This extreme claim seems necessary to justify the removal of officers of great value to the police force of Cincinnati. Thus Cincinnati must suffer from outside interference in her city matters. Could she be permitted to control her own internal affairs, doubtless she would exhibit the truth of the fundamental and vital doctrine of efficient and vigilant “ home rule.”
The citizens of Cincinnati, and these police commissioners, had an interest that these officers should remain in office until by official misconduct they forfeited their right, and until the official misconduct was legally established. This right is not money or other property; but, like reputation, it is valuable to a good citizen.
*136 Are Cincinnati, and the officers thus removed without a hearing, entirely without remedy? The majority opinion says, “For an abuse of such power, the remedy is, either to the people in the election of a successor to the officer abusing the power reposed, or, when the removal is characterized by circumstances of flagrant abuse, he may be impeached and deprived of his office.”
What are the facts here as,to these remedies? Not for twenty months in the future will there be an election for a successor. Then the injured citizens can participate in defeating the re-election of one who has abused such extraordinary power. How inadequate is this remedy !
As to impeachment, the constitution, section 23, article 2, provides, “ The house of representatives shall have the sole power of impeachment.”
On January 11, 1886, when the governor’s term of office began, his party friends had a majority of six in that house. On the next day, January 12,1886, nine opposing members from Hamilton county, who legally held certificates entitling them to membership in that house, as was held without dissent by this court in the case of Daniel J. Dalton, Clerk, et al., v. Oliver Outcalt, et al., December 11, 1885, were turned out of that house and nine of his pnrty friends were taken in — thus obtaining a majority of twenty-four of his party friends.
With such conditions, no one would seek redress by impeachment. Laws and holdings, permitting such results, can not endure.