Hoffman v. Yoe.

---

## C. B. HOFFMAN v. W. T. YOE.

### No. 376.*    (58 Pac. 802.)

1. OFFICES AND OFFICERS—*Removal—Jurisdiction of Investigating Committee.* A legislative committee organized under the provisions of chapter 239 of the Laws of 1889 has no jurisdiction to investigate charges against an officer other than those submitted to it by the governor.

2. ———— *Method of Determining Guilt— Majority Vote.* The committee is required by said act to determine the guilt or innocence of the officer against whom such charges are preferred by a majority vote of the committee, and cannot lawfully determine the same in any other manner.

3. ———— *Sufficiency of Charges — Power of Courts.* It is within the province of the courts, at the instance of an officer whose removal from office is attempted under the provisions of said statute, to determine whether the charges upon which such removal is based are within the provisions of the statute and are sufficient to justify such removal.

Original proceeding in *quo warranto.* Opinion filed October 9, 1899. Judgment for plaintiff.

*G. C. Clemens,* and *T. J. Hudson,* for plaintiff.

*A. A. Godard,* attorney-general, for defendant.

---

* Reversed by supreme court December 9, 1899. See 61 Kan. 265, 59 Pac. 351.—REP.

The opinion of the court was deliverd by

MAHAN, P. J. : This is an original civil action, under article 7 of chapter 96, General Statutes of 1897 (Gen. Stat. 1899, §§ 4956–4963), to determine the right to the office of regent of the state agricultural college.

To the plaintiff's petition the defendant files a demurrer upon three grounds : (1) That we have no jurisdiction of the person of the defendant ; (2) that we have no jurisdiction of the subject-matter of the action ; and (3) that the petition does not state facts sufficient to constitute a cause of action. Neither in the oral argument nor in the brief are the first two grounds alluded to ; so we may take it that they are abandoned and give our attention to the third. The petition alleges that the plaintiff was duly appointed to the office in the month of March, 1897, and was confirmed by the senate for a term of four years beginning April 1, 1897 ; that he entered upon the duties of the office and continued in the full exercise and enjoyment thereof until the 11th day of May, 1899, when he was excluded therefrom by the defendant, who, on that day, unlawfully intruded into and usurped said office and wholly excluded the plaintiff therefrom, and has ever since usurped and unlawfully held and exercised the office and excluded the plaintiff therefrom ; and that the only pretense or claim the defendant makes of any right to the office is as follows : On the 29th day of March, 1899, there was filed in the office of the governor of the state a certain paper, a copy of which is set out and made a part of the petition. This is an affidavit made by one H. A. Perkins, which, after formal statements, makes two charges against the plaintiff. The first is that the president of the board, one John N. Limbocker, had drawn from the treasury

of the college the sum of fifteen dollars per month for his services in providing meals for the students at the college; that this was unlawful and beyond the power of the board of regents under the law; and that the plaintiff Hoffman, as such regent and treasurer of the board, had aided and abetted said Limbocker in drawing said sum of fifteen dollars per month for his alleged services in conducting a place where students and others were fed at the said college. The second charge is that said Limbocker and Hoffman, while acting as regents of said college, and during the month of June, 1897, with others, did transact business of vital importance to the college without a quorum, secretly and unlawfully; that they did at that meeting hire teachers, fix their salaries, make appropriations, and did other business without at any time having a quorum, all in violation of law, and with the full intent and purpose of overriding and thwarting the will of the majority of the members of the board, "who prior to that time had been present"; that said action was in violation of law; that said meetings so held and for the purpose aforesaid were held, or meetings preliminary thereto were held, at the hotel in Manhattan, and were afterward entered upon the books at the college; that the records of said college were so kept by the secretary, Thomas E. Will, who is also president of the college and a subservient tool of the said Hoffman and Limbocker, that they purport to show on their face that the said meetings were legal and lawful and that a full quorum was present, whereas, in truth and in fact, no quorum was present, and by this means the said members of the board have falsified the records.

Upon the filing of this paper the governor made an order suspending the plaintiff as a member of said

board of regents, and the governor, the lieutenant-governor and the speaker of the house of representatives selected a committee of two senators and three representatives to inquire into the truth of said charges and make report, as provided by law. Said committee, having organized, caused to be sent by its clerk to the plaintiff a notice in writing to the effect that a motion of the plaintiff to make the charges against him more definite and certain had been over-ruled, and that the committee had given permission to Perkins to file an amended complaint by six o'clock of April 14, 1899, and that the plaintiff be given until six o'clock Monday, April 17, 1899, to answer thereto, and that the further hearing under said amended complaint be held on Wednesday, April 19, 1899, at two o'clock P. M. This notice purported to be sent by the clerk of the committee. Thereupon the plaintiff protested, in writing, against this action of the committee, and objected to the committee's proceeding to a hearing upon said amended complaint, and moved that it be stricken from the files, and announced his readiness to proceed with the investigation upon the complaint submitted to the committee by the governor under the statute. The subject-matter of the protest was that the committee, being purely statutory, had only such authority as is conferred upon it by the statute, and that it had no authority to enter upon or investigate any charges except such as were submitted to it by the governor, and had no authority to require the plaintiff to answer the charges in writing.

Said committee on convening overruled, denied and rejected the protest and motion, and proceeded to investigate the charges contained in the amended complaint as the sole basis thereof. The committee then employed a stenographer for the purpose of preserv-

ing the testimony, as required by law, all of which, being very voluminous, was taken down by the stenographer in shorthand, which nobody save himself could transcribe or write; having concluded the investigation without determining from the evidence, by majority vote or otherwise, the truth or falsity of the original charges, or of any of the charges contained in the amended complaint, they made and filed with the governor a report, which is set out and made a part of the petition. They made no further report whatever, and they did not transmit to the governor the evidence in the case, nor had such evidence, at the time of filing the petition, been transmitted or filed with him, but the committee did file the shorthand notes taken by the stenographer, which are utterly unintelligible to any other person than the stenographer. The evidence in the case had not in any other manner been transmitted or presented to the governor, and the shorthand notes remained at the time of filing the petition untranscribed. The governor could not read the notes, and they were not read to him. He made an order of removal, removing the plaintiff from the office, upon the theory that he was not called upon and had not the right to examine the evidence, but that his duties were purely ministerial, and that he was bound to act upon the rendition of the report of said committee, without review or discretion upon his part. On the 5th day of May, 1899, the governor sent to the plaintiff a notice of his removal entitled "In the Matter of the Charges against Limbocker." The notice recites that, in pursuance of law and the finding and report of the committee appointed to investigate the charges in writing made against the plaintiff by H. A. Perkins, and filed in the governor's

office on the 29th of March, 1899, calling in question the official conduct of the plaintiff as one of the regents of the Kansas State Agricultural College, the plaintiff was thereby discharged and dismissed from further survice as such regent.

The amended complaint contained eight specific charges, including the two original charges contained in the complaint filed with the governor, which are in the amended complaint considerably amplified. Omitting the formal parts of the report of committee, the following is a copy of what it terms its findings and recommendations:

### "FINDINGS.

"*First charge.* We find that John N. Limbocker and C. B. Hoffman were, at and during the time complained of in said charge, regents of the Kansas State Agricultural College, and that John N. Limbocker was the president of the said board of regents and the said C. B. Hoffman was treasurer.

"A revolving fund of $300 was appropriated and set aside by Regent and Treasurer Hoffman, and placed to the credit of John N. Limbocker in the Dickinson County Bank, for the purpose of maintaining a dining-hall where meals were to be furnished to students, members of the faculty and other persons visiting said college at such prices and on such terms as provided by the board of regents.

"We further find that by order of the board of regents the sum of $250 was set apart for the use and benefit of the department of domestic science, and that a part of said sum, the exact amount of which your committee is unable to state because of the indefinite and uncertain data furnished upon that part, was expended in the purchase of furnishings and materials for the operation of said dining-hall.

"We further find that Regent John N. Limbocker was by the said board of regents, of which he was a member, engaged and employed as the purchasing agent for said dining-hall at the salary of fifteen dol-

lars per month; that pursuant to said employment and while acting as a regent of said college he entered upon the discharge of the duties as such purchasing agent on or about the 1st of September, 1898, and continued to so act until the date of his suspension, which occurred on the 29th day of March, 1899.

"We further find that the treasurer of said college paid to said John N. Limbocker for services aforesaid the sum of $105.

"Your committee further finds that said dining-hall was instituted and operated by the said board of regents aforesaid, not for the purpose of instruction in any of the branches of learning for which said college was instituted, but for the purpose of furnishing meals for the students and other persons connected with the college.

"Owing to the indefinite, vague and obscure manner in which the books of the college have been kept under the direction of the president and his assistant, we are unable to state whether or not the said dining-hall has been operated at a loss to the funds of said institution.

"The committee further finds that, by order of the board of regents of said Kansas State Agricultural College, Professor Walters, a member of the faculty of said college, was authorized to draw checks on the treasurer of said college in amount not exceeding $1000, for the purpose of establishing and maintaining a bookstore in connection with said college.

"That pursuant to said arrangement the sum of $700 was drawn upon and expended as a sort of revolving fund in the establishment and maintenance of said bookstore; that said bookstore is still conducted under the direction of Professor Walters as a part of said college work.

"Your committee further finds that there was no warrant or authority of law authorizing the operation and maintenance of said dining-hall or of the bookstore heretofore mentioned, or of either of them.

"In the matter of the second specification of said court, wherein Hoffman and Limbocker were charged with furnishing supplies to said institution, we find

that Regent Hoffman, at the solicitation of members of the faculty at the said college, did furnish flour and bran to said college, while acting as a member of the board of regents, but in so far as he is charged with furnishing these articles at a price above the market price, we find that the charge is not sustained by the evidence.

"We further find that the charge against Regent Limbocker of furnishing supplies to said college is not sustained by the evidence.

"*Second charge.* We find that the meetings alleged to have been held on the 2d, 3d, 5th and 6th days of July, 1897, were held without any quorum being present at any of said meetings, and that teachers were hired, salaries were fixed, appropriations of money made, and a vast amount of other business was transacted during said time ; that at no time during the July meeting, after the 1st day of said month, was there a quorum present, and that only three regents, to wit, Hudson, Hoffman, and Limbocker, were present.

"We further find that among other matters of business that were transacted during the month of July, when no quorum was present, a manifesto was issued and published setting forth various reasons for change in the management of said college, and that said manifesto purported to be the act of all the board of regents of said college, when in fact and in truth the only regents present giving sanction to said manifesto were Regents Hoffman, Hudson, and Limbocker.

"That the minutes of said meeting held on the 2d day of July, 1897, recite that the ' board met,' when in fact and in truth only three members of the board met ; that there was no recitation in the minutes of said meeting held on the 2d day of · July, 1897, that showed that no quorum was present.   But the minutes of July 3, 5 and 6 show that no quorum was present and no business transacted except to adjourn.

"We further find that at the September, 1897, meeting of the said board of regents a resolution was passed approving the minutes of the said meeting as held on June 30 and ending July 6, inclusive ; and alleging that each and every part thereof was adopted

and made a part of the regular action of the board of said meeting, and thereby declaring the same to be fully ratified and confirmed as done at said July meeting.

"We further find that during the interim between July and September Regent Kelly died and Mr. G. M. Munger was appointed in his place, and attended and participated in said September meeting, and the votes in favor of said ratification were cast by Hoffman, Hudson, Limbocker, and Munger.

"But there was no correction of the minutes of said July meeting to show that no quorum was present.

"We further find that the allegation charging that preliminary meetings were held at the hotel at Manhattan and afterwards transferred and entered upon the records of the college is not sustained by the evidence.

"*Third charge.* With the exception of the matter contained in this charge relating to the statement of the board of regents concerning the reasons for certain changes made at the said college, and which matter we think has received sufficient attention in the findings of the second charge, we find that the allegations contained in the third charge are not supported by the evidence.

"*Fourth charge.* We find that the report of the board of regents of said college, found on page 18 of their Eleventh Biennial Report, shows that the total receipts of said college for 1897–'98 were $55,663.80; that the amount expended was $56,403.12; thereby making the amount expended above the receipts $739.32, in violation of chapter 17 of the Session Laws of 1897.

"In the matter of the payment of teachers, as alleged in said fourth charge, we find that on pages 3 and 4 of the Eleventh Biennial Report of said board of regents, in next to the last column thereof, the total amount paid is fixed at $40,736.67, when in fact and in truth, owing to a change in the date of the school years from September 1 to June 1, in order to make the school years correspond with the fiscal years, a much larger sum of money was paid than that pur-

ported, and we are unable to state the exact amount, and were unable to ascertain the same from the books of the college.

"We further find that, owing to the discharge of certain teachers and the employment of others, that in some instances the salaries for July and August, 1897, were doubled, and that salaries were paid in such cases to two persons occupying the same position for the same time.

"*Fifth charge.* We find that the sum of $200 was appropriated by the legislature of 1897 for an agricultural museum, and that the sum of about $125 of said appropriation was expended for the benefit of the agricultural museum ; that plans had been drawn for the expenditure of the remainder of said appropriation ; that a short time before said balance should lapse to the state a voucher was made out, duly certified and approved by the treasurer of the board of regents, C. B. Hoffman, and said balance of about seventy-five dollars was drawn from the state treasurer and the same placed to the credit of the general funds of the college.

"That the work for which the seventy-five dollars was drawn was not completed nor commenced at the time the same was drawn, and has not been completed or finished since that time.

"*Sixth charge.* We find that the board of regents fixed the salary of I. D. Graham, secretary and instructor in said college during the school year of 1897–'98, at $1400 instead of $1200 as provided by the Session Laws of 1897.

"We further find that the said board of regents changed the title of said I. D. Graham's employment to read ' secretary, professor of bookkeeping, commercial law, and accounts,' instead of ' secretary and instructor ' ; but that the duties and labor performed by the said I. D. Graham for the year 1897–'98 were not greater than those previously performed in said position.

"We also find that the salary paid William C. Lee, who performed the duties of stenographer in the executive office, was fixed at $800 per year ; and that by

the provisions of the Session Laws of 1897 the salary of said position was fixed at $420.

"We further find that the title to the position of Mr. Lee was changed by the board of regents to that of 'private secretary to the president'; but the labors and duties performed by the said Lee were not changed or increased by the change of title, and that he only did and performed the duties and services of stenographer aforesaid.

"*Seventh charge.* (This charge was not investigated and no evidence offered.)

"*Eighth charge.* We find that this charge is not sustained by the evidence.

"*Ninth finding.* We further find that from June, 1897, until April, 1899, the records of the proceedings of the board of regents of said college were kept by the president by virtue of his office as secretary of said board of regents, on loose sheets of paper, and that the said sheets of paper were so marked, marred, blotted, interlined, erased and otherwise defaced as to be of questionable value as records of said college.

"That since this investigation began, and at the instance of said President Will, the said minutes as interpreted by him, owing to the numerous interlineations and erasures on said loose sheets, have been transferred to the permanent minute-book of said board of regents, but during all the time, from June, 1897, when the said Will became secretary of the said board, until April, 1899, and after this investigation began, the only records of meetings of the said board of regents were had and kept on loose sheets of paper as aforesaid.

"That the keeping of the records aforesaid was with the full knowledge of said board of regents.

"*Tenth finding.* We further find that the board of regents of said college held a meeting in the city of Manhattan on or about the 7th day of January, 1899, at which said meeting the said board authorized and directed the president of said college to enter into written contracts with a large number of the members of the faculty of said college for the two years ending June 30, 1901."

"RECOMMENDATIONS.

"Upon the findings aforesaid, we recommend that the said regents, John N. Limbocker and C. B. Hoffman, be discharged and dismissed from further service as members of the said board of regents.

"We transmit herewith stenographer's notes of the testimony, and the records in this case.

G. H. LAMB.<br/>
Z. L. WISE.<br/>
THOS. J. FLANNELY.<br/>
R. B. WARD."

These proceedings resulting in the attempted removal of the plaintiff, which he alleges are void, were had under the provisions of chapter 239 of the Laws of 1889 (Gen. Stat. 1897, ch. 6, §§ 33–35; Gen. Stat. 1899, §§ 6362–6364). Section 1 of that act provides that whenever charges shall be made by any person or persons, and circulated within the state or presented by such person or persons in writing to the governor, at any time when the legislature is not in session, and said charges shall be deemed worthy of credit or emanating from a reliable or trustworthy source, whereby the management or administration of the affairs of any charitable, educational or penal institution, or the official conduct of any officer in charge of or otherwise connected with any of said institutions, shall be called into question upon the grounds of corruption, venality, inefficiency, misconduct, immorality, or inattention to duties, an investigation shall be had as provided for in the second section of the act. Notice shall be given in writing to the official in charge of the institution, and also to the officer or each of the officers against whom complaint or charges have been made. The second section provides that the governor, the lieutenant-governor and the speaker of the house of representatives of the state shall meet at such time and

place as may be named by the governor, and they shall
proceed to select a committee of five members of the
legislature, whose duty shall be to inquire into the
truth of the charges, investigate the affairs of the in-
stitution, or examine into the official conduct of the
officer named in the complaint.   This section then
prescribes how the committee shall be constituted,
when they shall meet, how they shall organize, and
their powers.   It then provides that they shall employ
a clerk and cause a complete and full record of their
proceedings to be kept, and that they may employ a
stenographer and sergeant-at-arms for the purpose of
preserving the testimony produced.   Section 3 pro-
vides that, having concluded their investigation, the
committee shall, under the evidence and by a majority
vote of the whole number of the committee, determine
the truth or falsity of the charges.   They shall make
a complete report of their findings, and transmit the
testimony in the case to the governor, with such rec-
ommendations as they may deem just and appropriate.
The governor shall thereupon either dismiss or rein-
state the officer or officers named in the complaint,
according to the findings and report of the committee.
He shall also direct the attorney-general in cases
where the laws have been violated to institute such
proceedings in the courts as may be necessary to pro-
tect the interests of the state and punish offenders.

It is contended on behalf of the plaintiff that this
record discloses that the attempted removal of the
plaintiff from the office was not in conformity with
the statute, that it was therefore ineffectual, that no
vacancy was created, and hence that the governor
acted without authority of law in attempting to make
the appointment of the defendant to fill such assumed
vacancy.   The particular grounds upon which this con-

tention is based are, first, that the committee of the legislature selected by the governor, lieutenant-governor and speaker of the house of representatives had no authority to investigate any charges not first presented to the governor and by him adjudged to be worthy of credit or emanating from a reliable and trustworthy source, by means whereof the management or administration of the affairs of the college or the official conduct of the plaintiff as an officer was called into question upon the grounds specifically enumerated in the statute, viz., corruption, venality, inefficiency, misconduct, immorality, or inattention to duties, such charges to be submitted to the committee by the governor for its investigation; second, that the committee did not by a majority vote determine the truth or falsity of any of these charges, and did not report to the governor the evidence upon which their verdict was based, as required by the statute; and, third, that the findings of the committee do not separately or in gross afford any grounds for removal under the statute, conceding that they are legal and constitute such a report as the law contemplates.

The supreme court of this state, in *Lynch v. Chase*, 55 Kan. 371, 40 Pac. 667, said:

"Where the statute gives power of removal for cause, without specifying the causes, the power is necessarily of a discretionary nature, and the removing authority is the exclusive judge of the cause and the sufficiency thereof; but where the statute specifies the causes for removal and prescribes the procedure, it would seem that removals could not be made for other causes nor in any other method than that prescribed by the statute." (Mechem, Pub. Off. ¶ 452; *State, ex rel. Meader et al., v. Sullivan*, 58 Ohio St. 513, 51 N. E. 48; *Metevier v. Therrien*, 80 Mich. 187, 45 N. W. 78; *Dullam v. Willson*, 53 Mich. 410, 19 N. W. 112; *Andrews v. King*, 77 Me. 240–243.)

It does not seem necessary to cite authorities in support of the position that the committee could only investigate such charges as were submitted to them by the governor.     Before an officer can be called upon to respond in an investigation of this kind the duty devolves upon the governor to exercise his discretion as to whether the charges warrant it.     This is the effect of the decision of the supreme court in the case of *Householder v. Morrill*, 55 Kan. 317, 40 Pac. 664.     It was said there :

"By the provisions of the statute under which the governor assumed the right to act, he must first determine, before taking any steps whatever, whether the charges are worthy of credit or emanate from a reliable and trustworthy source.     This requires the exercise of judgment and discretion, and therefore is not a purely ministerial act."

It is judicial in its nature.     He must necessarily adjudge whether the charges made come within the purview of the statute.     If not, he has no occasion to summon a committee ; he has no right to suspend the officer.     The statute specifically prescribes that if he believes the charge to be within the statute he shall suspend the officer.     It nowhere gives the committee the authority to entertain other charges than those submitted by the governor.     It prescribes the duty of the committee clearly and definitely, and these are to organize, investigate the charges submitted by the governor, vote whether they find the officer guilty or not guilty, preserve the evidence, and report their proceedings with the evidence to the governor for his action.     The necessity of a vote upon these charges, to protect the officer, is very apparent.     The committee must vote upon each charge separately and not upon the whole.     They must keep a record of the vote and all

Hoffman v. Yoe.

their proceedings and report to the governor.   It is not sufficient that the vote on the entire charges be given, but they must vote upon each separately, so the governor may know whether a majority of the committee think that the officer is guilty or not guilty of the specific charge made in the complaint.   The statute defines the manner in which they shall determine this most important matter.   They cannot otherwise determine it.

It is likewise of grave importance that the evidence be made a part of the record, that the accused and the public may know whether there is any evidence to warrant his conviction.   The charge is of a criminal nature, and while it is true that mere informalities or mere irregularities will not defeat the action of the governor in the removal, a departure from the important restrictions of the statute ought to be held, and has been held, by the courts to render the action of the committee nugatory.   The failure to vote on the question of guilty or not guilty is not a mere irregularity or informality ; it is the very essence of the proceeding.   A failure to return the evidence is not a mere irregularity or an informality.   The courts have a right, at the instance of the officer deposed from his official position, to determine whether it has been legally done ; whether he has been deprived of this right of a citizen to hold office according to law.   If a committee, out of caprice, should determine his guilt without evidence, it would be the province of the court to quash the proceeding.   While it is true that there is no contractual relation existing between the officer and the public, and while it is likewise true that the officer has no property in his office, yet it is a valuable right, and one of which he cannot be deprived except according to the provision of the stat-

ute. The power of removal conferred by the statute must be pursued with strictness according to its terms. This is not asking too much.

In considering whether the findings of the committee, assuming that they can take the place of the vote required by the statute, are sufficient in themselves to justify a removal, we need not consider those findings based on the charges contained in the amended complaint, because it is clear to our minds that the committee had no authority to receive any amended complaint or take any action thereon. The first series of findings is based upon the charge in the original complaint that Limbocker received and Hoffman paid him fifteen dollars per month for services in connection with the superintendence of the dining-hall. The committee say a revolving fund of $300 was appropriated and set aside and placed to the credit of Limbocker in the Dickinson County Bank for the purpose of maintaining a dining-hall where meals were to be furnished to students, members of the faculty, and other persons visiting said college, and provided for by the board of regents.

They further find that by order of the board of regents the sum of $250 was set apart for the use and benefit of the department of domestic science, and that a part of said sum, the exact amount of which the committee are unable to state, because of the indefinite and uncertain data furnished upon that point, was expended for the purchase of furnishings and material for the operation of said dining-hall.

They further find that Regent John N. Limbocker was by the said board of regents, of which he was a member, engaged and employed as purchasing agent of the said dining-hall at a salary of fifteen dollars per month; that pursuant to said employment and while

acting as a regent of said college, he entered upon the discharge of the duties as such purchasing agent on or about the 1st of September, 1898, and continued so to act until the date of his suspension, which occurred on the 29th of March, 1899.

They further find that the treasurer of said college paid to said John N. Limbocker for his services aforesaid the sum of $105.   Do these findings import corruption, venality, misconduct, or immorality?   They can have no relation to the other grounds of inefficiency or inattention to duties.   They must comprise either corruption, venality, misconduct or immorality touching the discharge of the duties of the office.   We can see very clearly where the boarding-house keepers of Manhattan might have ground for complaint, but there is nothing in the findings upon which a charge of corruption can be predicated against the plaintiff Hoffman.   He could derive no benefit therefrom.   There is no finding, nor anything tending toward a finding, that it was the expectation of either Hoffman or Limbocker to profit by the maintenance of the dining-hall, except the pittance of fifteen dollars per month paid to Limbocker for his services.   A board of regents of a college endowed as is this college is necessarily vested with some discretionary authority, and it is not to be expected that specific authority for every act necessary to be performed or for the best interest of the institution or the students shall be found in the letter of the statute creating it or defining the powers and duties of the board.   In what does the immorality consist, or the misconduct?   It must be presumed, in the absence of a finding to the contrary, that it was deemed to be to the interest of the institution or the patrons of the institution that a dining-hall should be maintained for their benefit and advantage.   There

is nothing to negative the proposition that the students paid the fifteen dollars to cover the expenses of Limbocker as a caterer over and above the cost of its maintenance. Had there been a vote upon the charge as originally presented, that Limbocker drew from the treasury of the college fifteen dollars a month unlawfully, knowingly, and intentionally, it might be construed as misconduct, or corruption, or venality; but the finding is that the treasurer paid to Limbocker for his services the sum of $105. That may be true, and yet the treasury of the college, properly speaking, be found not to be depleted one single mill.

The other charge contained in the complaint is that Hoffman and Limbocker as regents of the college during the month of June, 1897, transacted business of vital importance to the college without a quorum, secretly and unlawfully; that they hired teachers, fixed salaries, made appropriations, without having a quorum, in violation of law, and with the full intent and purpose of overriding and thwarting the will of the majority of the board, who, prior to that time, had been present; that said action was in violation of law; that the preliminary meetings were held at a hotel at Manhattan, and afterward entered on the books of the college, and that through the aid of the secretary of the college they falsified the records respecting said meeting. Now, had there been a vote of guilty upon this charge contained in the complaint, it might reasonably be held that the plaintiff was guilty of corruption, but there was no such vote, and there is no such finding in the record tantamount to the result of such a vote. It is true that the committee find that meetings were held on the 2d, 3d, 4th, 5th and 6th of July, and that the record does not disclose whether there was a quorum at the first meeting or not, but

it does disclose that there was not a quorum at each of the subsequent meetings.

The committee further find that at a September meeting following the board of regents, by resolution, approved all the minutes and action of the board at those meetings in June and July, and adopted the same and made the action of the regents at that time the action of the board, and declared the same to be fully ratified and affirmed as done at this meeting. It is true the finding goes on to say that certain members, being a majority of the board, one of whom was appointed subsequently to the meetings of June and July, voted for this resolution ratifying the action of the board when it met without a full quorum. Had the evidence been reported and become a part of the record to be brought before the court for its investigation as a part of the report of the committee, as required by the statute, the circumstances surrounding the members of the board at that time might be fully developed, but it cannot be said that the findings as a whole show venality, corruption, inefficiency, misconduct, immorality, or inattention to duties. It is the duty of the court to determine whether the findings of the committee constitute an offense in the eyes of the law, to justify the act of removal. It was so considered in *Rogers v. Morrill*, 55 Kan. 737, 42 Pac. 355.

The statute says that the committee shall recommend to the governor their idea of the proper action to be taken upon the result of their investigation. This can only mean that the governor is to exercise his judgment and discretion finally. It is not the judgment of the committee but the judgment of the governor that determines the result finally. So that it is the duty of the governor not only to examine the

report and the recommendations, but to examine the evidence accompanying the report and every part of the report on the charges submitted to the committee. It is alleged in the petition, and is apparent from the record accompanying it, that the governor rendered his judgment entirely upon the findings and recommendations of the committee. The law intends that an officer shall be removed for cause only, and those causes are specifically enumerated in the statute. It was not intended that the governor should act upon anything else than the conviction of the officer upon the specific charge made against him, and an attempt to adjudge an officer guilty and remove him upon any other ground or in any other manner than that provided by the statute is without authority of law and void.

The reputation of a citizen of the state holding an office ought not to be besmirched, a stigma of reproach fixed to it and the citizen deprived of a valuable right except for some serious misfeasance or non-feasance in respect to his office, or some conduct or immorality that renders him unfit for its performance. Otherwise honorable men would be deterred from accepting office and serving the state to its best interests. The state would be deprived of the services of its best citizens and its interests turned over to political adventurers and speculators in public office. It is evident that the legislature did not intend that these state officers should be at the caprice or mercy of the chief executive, or of a legislative committee convened at his suggestion. Substantial and not frivolous charges against the officer are necessary to secure his removal. (*Lynch v. Chase,* supra; *State, ex rel. Meader et al., v. Sullivan,* supra; Mechem, Pub. Off. ¶ 452; *State v. Common Council,* 53 Minn. 238, 55 N. W. 118; *Dubuc*

*v. Voss*, 92 Am. Dec. 526 ; *State v. Hastings*, 37 Neb. 96,
55 N. W. 774 ; *Andrews v. King*, 77 Me. 230 ; *Dul-
lam v. Willson*, supra ; *Metevier v. Therrien*, supra.)
None of the authorities cited by counsel for the de-
fendant supports the contrary of the conclusions we
have reached. A number of these authorities relate
to cases of removal where the power was absolute, to
be exercised at the discretion of the removing power.
Such is the case in *Carter v. City of Durango*, 16 Colo.
534, 27 Pac. 1057, and in *Williams v. Gloucester*, 148
Mass. 256, 19 N. E. 348. Others relate to cases in-
volving objections of a merely informal or technical
nature. Such were the cases of *People, ex rel. Flana-
gan, v. Bd. Police Comm'rs, etc.*, 93 N. Y. 97, and *People,
ex rel. Keech, v. Thompson*, 94 N. Y. 461.

It is not contended, nor do we decide, that the trial
by the legislative committee should be conducted
strictly under the rules of law governing courts ; nor
do we hold that it is necessary that the charges should
be as formal as was necessary in an indictment at
common law or in an information under our criminal
practice. The case of *Householder v. Morrill*, supra,
does not militate against our conclusions. It is not
necessarily implied, nor do we mean to say, that the
governor of the state of Kansas is inferior to this court
or to the supreme court, nor do we pretend to say
that we can control his discretionary powers as such
officer. In that case it was sought by a writ of man-
damus to compel the governor to revoke an order of
suspension made by him. Nor is there anything to be
found in *Lynch v. Chase*, supra, not in full accord with
what we decide herein. We say that an officer has
no vested rights in his office ; that the relation is not
contractual. We admit that it has been fully settled
that the legislature has power to confer the power of

removal upon executive and administrative officers, and that their action in the premises is not strictly judicial and only *quasi* judicial. We admit that the committee appointed by the governor, lieutenant-governor and speaker had authority to investigate the charges submitted to them by the governor, and that where, upon a sufficient notice, and upon sufficient charges being made and sustained by the committee and approved by the governor, the proceedings had being in accord with the statute, the power of removal exists. We further say that the same formality and precision in the trial are not required as in a trial before the court, and so it was held in *McMaster v. Herald*, 56 Kan. 231, 42 Pac. 697.

We have carefully examined the decisions of our supreme court construing this statute and the proceedings thereunder, and find nothing that is not in perfect harmony with the decisions on questions of law at which we have arrived herein.

It was stated by counsel for the defendant upon the argument and in the brief, and it was agreed, that the defendant would stand upon the demurrer and that final judgment should be rendered without further pleading.

There will be judgment for the plaintiff against the defendant, ousting the defendant from the office of regent of the state agricultural college and reinstating the plaintiff therein.

McElroy, J., concurring.

Wells, J. (dissenting): It seems to me that the pivotal question in this case is as to the object and purpose of the law in authorizing investigations of this character. What is the nature of the proceeding? If it is of a criminal nature, as assumed in the foregoing

opinion, the judgment of this court is correct.  Is the primary object of the law the punishment of an officer, or to maintain the integrity, usefulness and standing of the charitable, educational and penal institutions of the state?  If this is a criminal proceeding, the law must be strictly followed; nothing can be taken by implication, and all presumptions must be in favor of the accused.  If a criminal proceeding was intended, what necessity was there for this law?  Courts were already provided, with well-settled rules of procedure, for the trial of criminal matters, and all that the legislature would have been required to do was to define the offense and prescribe the punishment.  The title of the act under which this proceeding was had is: "An act providing for the appointment of committees to investigate the affairs of state institutions and conduct of officers."  The meaning of "investigate" and "trial" is not the same.  The one means to search into, to inquire and examine into with care; the other means the formal examination of the matter at issue.  The one is informal; the other formal.  The one is to find the truth, whatever it may be; the other to settle an issue already joined.

There is no provision in the statute for the filing of a formal complaint or indictment in cases of this kind upon which the simple issue of guilty or not guilty could be tried.

"Whenever charges shall be made by any person or persons and circulated within the state or presented by such person in writing to the governor, at any time when the legislature is not in session, and said charges shall be deemed worthy of credit, or emanating from a reliable and trustworthy source, . . . notice shall be given in writing to the official in charge of the institution, and also to the officer or each of the offi-

cers against whom complaint or charges have been made or preferred, which notice shall contain the substance of the matter charged. . . . The governor, lieutenant-governor and the speaker of the house of representatives of the state shall meet, . . . and they shall proceed to select a committee, . . . the duty of which committee, when selected, shall be to inquire into the truth of the charges, investigate the affairs of the institution, or examine into the official conduct of the officer named in the complaint."

The terms "charges" and "complaint" are evidently used in a comprehensive sense as referring to that upon which the governor acted, whether circulated within the state or presented in writing.

The proceeding is an investigation, not a trial.

"As the committee does not constitute a court, and as the incidents and common-law rights of a court trial are not required, the objections made in regard to certain informalities and irregularities are unavailing. . . . The evidence was heard and considered by a tribunal created for that purpose, and the duty of determining its sufficiency belongs to that tribunal, and not to the court. Testimony was offered to sustain and refute the charges, and the weight and sufficiency of that testimony, as well as the fact of whether cause was shown, were concluded by the determination of the committee and the action of the governor." (*Lynch v. Chase,* 55 Kan. 378, 40 Pac. 669.)

The law making no requirements for a formal charge, but only that the notice shall contain the substance of the matter charged, it seems clear to me that a formal issue of guilty or not guilty was not intended to be made, but the question was: Has the institution whose affairs are being investigated been conducted in a manner tending to destroy or retard its usefulness, reputation or efficiency in the general direction indicated by the accusation? This can be best determined by finding just what has been done.

Whether the acts done are sufficient evidence of "corruption, venality, inefficiency, misconduct, immorality, or inattention to duties," or not, were questions to be determined by the committee, and their recommendation was the only authority upon which the governor was authorized to act.